John B. BURWELL, Appellant,

v.

Thomas V. CRIST and Barbara Crist, His Wife.

No. 15911.

United States Court of Appeals Third Circuit.

Argued Nov. 3, 1966.

Decided Feb. 2, 1967.

Macey E. Klein, Harrisburg, Pa. (Solomon Hurwitz, Hurwitz, Klein, Meyers & Benjamin, Harrisburg, Pa., on the brief), for appellant.

John C. Dowling, Harrisburg, Pa. (Huette F. Dowling, Dowling & Dowling, Harrisburg, Pa., on the brief), for appellees.

Before GANEY, SMITH and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

GANEY, Circuit Judge.

This matter comes before the court on an appeal from the denial by the lower court of a motion for a new trial.

The defendants were the operators of a camp for children, known as Mountain Lake Camp, in Fannettsburg, Franklin County, Pennsylvania.

Sometime in the early summer of 1963, Jill Burwell, aged 11 years, entered the camp, which was co-ed, composed of a number of other children. Her parents selected the Mountain Lake Camp as a summer camp for their child because, as the decedent's father testified, they had examined the brochures from various camps and picked Mountain Lake out of all the others "and I liked the things it said, the things it said about the care of children, the things it said about Mr. Crist and Mrs. Crist and their qualifications." The father and mother drove Jill to the camp, placed her therein and, ad-

ditionally, authorized the authorities to give her riding lessons, for which an extra fee was charged by the camp. When they left her at the camp, Jill was in a perfect state of health, having brought to the camp with her a certificate of physical fitness. Her parents never saw her after they left her at the camp until she was brought home dead. Mr. and Mrs. Burwell, the decedent's parents, never received any explanation or description of the way Jill met her death from either Mr. or Mrs. Crist, who were the owners and operators of the camp. It was further testified that when the child was brought to the dispensary of Chambersburg Hospital, accompanied by an individual from the Mountain Lake Camp, the doctor who treated her upon arrival testified that he was told by a nurse that the child had been kicked by a horse and that the cause of death was a fracture of the base of the skull. There was no objection offered to this testimony. One of the defendants, Thomas V. Crist, called on cross-examination, testified that, at the time of the accident, one John Armogost was the riding instructor at the camp and that he, Armogost, had advised him that he was present when the fatal accident occurred.

■■■ Robert W. Filer, a Pennsylvania State Policeman, who came to the camp because he was making an official investigation as to the cause of Jill's death, testified that he went to Mrs. Crist, co-owner of the camp with her husband, and she took him to the riding arena where she introduced him to Armogost, and he proposed to testify that he questioned Armogost, the riding instructor at the camp, in the presence of Mrs. Crist and that she was present during the conversation he had with Armogost when the discussion started, although he could not say how long she remained. The subject matter of the conversation which Armogost had with the State Policeman was as follows: That the decedent, Jill Burwell, had watered her horse and was walking in an eastwardly direction on the left side of the horse with the bridle in her right hand; that as she was walking

away from the water trough another camper riding a horse named "Sonny" passed her on the north side; that he heard a thud and when he looked, he saw Jill lying on the ground and that the horse had kicked Jill. The court rejected the admission of this testimony as hearsay and, accordingly, it was disallowed. We think this was reversible error. Here, the State Trooper, upon arrival at the camp, went to the highest person in authority, one of the co-owners, Mrs. Crist, and she directed him to the riding instructor who had witnessed the accident in order to find out what caused Jill's death as he was making an official investigation. Mrs. Crist not only directed the Trooper to one present at the incident and who had knowledge of it, but accompanied him to the riding arena, where her riding instructor, Armogost, was interviewed by the State Policeman while she was there, during part of the conversation. It is submitted that here the owner of the camp, Mrs. Crist, by her direction of Policeman Filer to Armogost who knew of the happenings of the incident and who was riding instructor and was in charge of the horses at the camp, and, furthermore, since she accompanied the Policeman to the riding arena to meet Armogost, and stayed, at least a portion of the time while the State Policeman was interviewing him, showed that she made Armogost her agent for the purpose of informing the Policeman concerning what had occurred. Further, her conduct, in so doing, if it was not tantamount to making Armogost her agent to speak on her behalf of the incident, she was at least bound by the conversation since she was there at least during a part thereof. Baker v. Westmoreland & Cambria Natural Gas Co., 157 Pa. 593, at 600, 27 A. 789.

In 31A C.J.S. Evidence § 352, it states: "Admissions by a third person acting in accordance with his authority are admissible against one who has expressly referred another to such third person for information with respect to an uncertain or disputed fact. A declaration competent as an admission may be made by

one to whom the party to be affected by it has sent another for information on a given point, where the person to be affected has indicated that declarant is authorized to speak for him, as under such circumstances a relation of agency within the scope of the reference is established." General Finance v. Stratford, 71 App.D.C. 343, 109 F.2d 843.

There was further evidence that there were seven or eight horses riding that evening and Eleanor Wieman, who had been at the camp two weeks before the date of Jill Burwell's death, testified that she was right with the horses and observed one of the horses lash out violently once or twice at another horse and, when questioned further as to what "lash out" meant, she replied, "Well, really kick, you know, kick at another horse. I thought the horse would drop the one it had kicked." She reported the episode to one of the employees at the window of the camp nearby.

Helen Simmons testified that she had been a student at Wood College at Frederick, Maryland, was in her junior year and was 21 years of age when she was in charge of the riding program at Mountain Lake Camp with one boy assisting her, and that she had left approximately two weeks before this incident at the camp. She testified that the horse, "Sonny", which kicked the decedent, was a good horse, but, upon being permitted to cross-examine her, because of a prior contradictory statement, she testified that the horse "Sonny", reacted, when approached by another horse, as follows:

"A. If a horse got too close to her and bothered her she would kick.

Q. What do you mean by if a horse got close to her and bothered her?

A. Well, if a horse sniffed at her, rubbed her, or made an approach as if to bite her, then she would kick."

She further testified that one day when riding "Sonny" a horse came up behind her too close and she lifted one of her legs as if to kick, but the horse did not actually lash out and kick. She testified

that if the horse had really kicked, she would have landed on the ground.

Mrs. Crist, one of the co-owners, said that she never had any conversation about the condition of the horses and was rather vague about any discussion concerning their being overworked, although Miss Simmons had testified that previously she had objected to the owners as to the number of hours the horses had been ridden in warm weather.

The brochure, adverted to above, which persuaded Mrs. Burwell to send her daughter, the decedent, Jill, to Mountain Lake Camp, stated under the heading "RIDING": *"These horses have been carefully selected for gentleness and are ideally suited for work with children."* (Italics ours.)

It is submitted that, while the case was poorly developed from the standpoint of the plaintiff, there was sufficient evidence from the proven facts and the inferences properly to be deducible therefrom to show that the horses in the camp were not "carefully selected for gentleness" and were not "ideally suited for work with children.", and that the matter should have been submitted to a jury.

Additionally, there was sufficient evidence to go to the jury of the fractious nature of the horses in the camp and especially knowledge on the part of the owners that the horse which kicked Jill, fracturing her skull and causing her death, would kick whenever another horse merely sniffed at her or would come close to her and required the highest duty of care for Jill's protection by reason of her tender years and the fact that her parents had entrusted her care to the owners of the camp.

Here, an 11 year old girl, whose parents paid not only the charge the camp required of those admitted to it, but, additionally, an extra fee for riding, was entitled to the highest degree of care on the part of the owners in the selection of the horses not only to be ridden by her, but also for her protection in every phase of her activities in connection therewith.

Accordingly, the judgment of the lower court will be reversed and the case remanded for a new trial.

WILLIAM F. SMITH, Circuit Judge, joins in this opinion, together with the views expressed in the concurring opinion.

FREEDMAN, Circuit Judge (concurring).

There are two serious problems in the case: one is whether the evidence of Corporal Filer of the Pennsylvania State Police regarding the statements made to him by the riding master, Armogost, was admissible; the other is whether, with Filer's testimony admitted, there would be enough evidence to warrant submission of the case to the jury. On both questions the evidence is extremely meager and unsatisfactory, and there can be no doubt that on a new trial the interests of justice will be well served by affording the parties an opportunity to develop the evidence more fully.

On the first question, despite the meagerness of the record on why the defendant, Mrs. Crist, took Corporal Filer to meet Armogost, I believe the proffered evidence should not have been excluded as a matter of law. Rather, it seems to me, the evidence should have been submitted to the jury with instructions by the court that the jury should consider it only if it determined from the surrounding circumstances that Mrs. Crist intended that Armogost's statement should be considered as an explanation on her behalf, through her employee familiar with the facts, of what had happened.

If the jury determined that the testimony of Corporal Filer should be considered on the merits, although the evidence is extraordinarily sparse, I believe there is enough to have required submission of the case to the jury. Plaintiffs entrusted their young daughter to the defendants who operated a camp for children and advertised that they specialized in riding instructions and had carefully selected their horses for their gentleness and suitability for use by children.

Pennsylvania, of course, does not apply in a case such as this either the doctrines of res ipsa loquitur or exclusive control. But the evidence of Corporal Filer and that of the other witnesses referred to in Judge Ganey's opinion shows that the horses were at the watering place with no apparent supervision and that it was there that the decedent was kicked and killed by a horse which had already been shown to exhibit a vicious temper.

I therefore join in the decision to reverse and award a new trial.