**JIM HENSON PRODUCTIONS, INC. Jane Henson, and Albert Gottesman as Executor of the Estate of Jim Henson, Plaintiff,**

v.

**JOHN T. BRADY & ASSOCIATES, INC., and Coffee Associates, Inc., Defendants.**

**No. 92 Civ. 5115(LAP).**

United States District Court, S.D. New York.

Oct. 9, 1997.

---

Carol F. Simkin, Lisa Pearson, James D. Silberstein, Rose Auslander, Fross Zelnick Lehrman & Zissu, P.C., New York City, for plaintiffs.

Peter D. Raymond, Jeffrey M. Tamarin, Hara K. Jacobs, Hall Dickler Kent Friedman & Wood LLP, New York City, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRESKA, District Judge.

This copyright action arises out of a disputed copyright assignment and the scope of the rights transferred pursuant to the as-

signment from plaintiffs (the "Hensons") to the defendants (the "Wilkins Company"). In a previous Memorandum and Order, I granted in part and denied in part the parties' cross-motions for summary judgment on plaintiffs' claims for trademark infringement, copyright infringement, infringement of right to publicity, unfair competition and breach of contract, disposing of several of these claims. *Jim Henson Productions, Inc. v. John T. Brady & Assocs., Inc.*, 867 F.Supp. 175 (S.D.N.Y.1994) ("*JHP, Inc.*"). The copyright claim was tried to the bench over seven days, and at the conclusion of the trial I reserved decision. Subsequent to the trial, the parties submitted proposed findings of fact and post-trial memoranda on the issue of current ownership to the copyright rights to certain mup-

pets created by plaintiffs. Pursuant to Rule 52(a) of the Federal Rules of Civil procedure, I now issue the following findings of fact and conclusions of law in support of my decision in favor of plaintiffs.

## FINDINGS OF FACT

1. This action arises out of a dispute over the ownership of the copyrights in two puppet characters named Wilkins and Wontkins created and performed by or at the direction of Jim Henson for certain commercials for the John H. Wilkins Company as more fully described below.[1]

*Facts Concerning the Hensons*

2. Jim Henson was a world renowned puppeteer who, through his talents as a per-

1. A total of roughly 40 fact witnesses have been deposed in this lawsuit, including all available persons who have been identified by the parties or witnesses as the persons most knowledgeable on the issues pertaining to this matter. Included among the persons who have been deposed are Jane Henson, Jerry Juhl, Frank Oz, Peter Schube, officers of the John H. Wilkins Company, and the buyers and sellers in each of the above transactions, as follows:

(a) With respect to the John H. Wilkins Company, Roger H. Hefler (Videotaped deposition of Roger H. Hefler ("Hefler") sworn to on May 13, 1993 at 5–6), the Executive Vice President, President and ultimately Chief Executive Officer and Chairman of the Board of the John H. Wilkins Company, who was responsible for running its day-to-day operations from the late 1950s until 1973. (Pl.Ex. 49 (¶¶ 14, 22); Pl.Ex. 42 (M001325)); E. William Furey, the John H. Wilkins Company's former general counsel and its current President and sole shareholder. (Deposition of E. William Furey ("Furey") sworn to on April 29, 1993 at 11 and 57–58);

(b) Helen Ver Standig, the only surviving employee of the Belmont Ver Standig advertising agency which, as discussed below in paragraphs 35 and 47, was the John H. Wilkins Company's advertising agency during the 1950s until roughly November 31, 1960 and which played a role with respect to the relationship between the Hensons and the John H. Wilkins Company. (Pl. Exs.24G, 25(F); Deposition of Helen Ver Standig ("Ver Standig") sworn to on May 3, 1993 at 10–13, 19, 21; Hefler 44–45);

(c) With respect to the 1974 Asset Purchase Agreement, as previously mentioned, E. William Furey, the lawyer who was the principal negotiator for the John H. Wilkins Company (Furey at 7–9, 47, 145); William H. Ashplant, the President, Chief Executive Officer and Chairman of Halco and later Tobin Packing Company ("Tobin"), who has been identified as the most knowledgeable person connected with Halco

with respect to the terms and nature of the transaction between Halco and the John H. Wilkins Company and who was also responsible for running the day-to-day operations of Halco and Tobin (Deposition of William Ashplant ("Ashplant") sworn to on June 3, 1993 at 7, 13, 14, 22; Furey at 145–46; Deposition of Robert Hatch sworn to on May 27, 1993 ("Hatch II") at 35–37, 45–46, 51, 56–57; Pl.Ex. 49 (¶ 32));

(d) With respect to the 1981 Asset Purchase Agreement, Robert N. Hatch, the former President of the Wilkins Corporation and Wilkins Service Inc., E. Lee Winegar, also the former President of Wilkins Service and treasurer and secretary thereof, as well as Mr. Ashplant, as previously noted (Winegar 44–45; Deposition of Robert Hatch sworn to on November 5, 1992 ("Hatch I") 10–12, Hatch II 37, 70; Deposition of Robert Hatch sworn to on May 31, 1995 ("Hatch III") 11–12). Mr. Hatch was the President and Chief Executive Officer of Wilkins Coffee, Inc., a position he assumed in January, 1993, until roughly the Spring of 1996. Mr. Hatch was deposed as a third-party witness on November 5, 1992, and on May 31, 1995. He was designated by defendant Coffee Associates, Inc. (then known as Wilkins Coffee, Inc.), pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, as the person most knowledgeable about the chain of title from the John H. Wilkins Company to Wilkins Coffee, Inc. with respect to the Wilkins and Wontkins characters and he appeared for a deposition on that subject on May 27, 1993. He also was designated by defendant Coffee Associates, Inc., pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, as the person most knowledgeable about the Asset Purchase and Sale Agreement between Wilkins Coffee, Inc. and Royal Cup, Inc. and he appeared for deposition on December 6, 1996. (Hatch I at 10; Hatch II at 6, 10; Hatch III at 4; Deposition of Robert Hatch sworn to on December 6, 1996 ("Hatch IV") at 5; (Ashplant at 56).

former, designer and writer, and his innovative use of television and previously the motion picture medium, created "the Muppets", a now-famous family of original puppets including Kermit the Frog, Miss Piggy, and Big Bird. Mr. Henson (and his company, Jim Henson Productions, Inc.) have won numerous awards including Emmy and Grammy awards for excellence in the art of puppetry. (Pl.Exs.4, 16–22, 86–87). Mr. Henson passed away suddenly in 1990 at the age of 53.

3. Jane Nebel Henson is a talented puppeteer who was involved in much of Mr. Henson's early work and routinely attended business meetings and discussed with Mr. Henson the business aspects of their work. (Deposition of Jane Henson ("Jane Henson") sworn to on Jan. 27, and June 7, 1993, 6–14, 17, 21, 23–24, 201–03; *see, e.g.,* Pl.Ex. 45 (¶ 11); Pl.Ex. 12).

4. An essential aspect of Mr. Henson's art form was his personal performance of his puppets. He was an entertainer who performed his own puppets and was not engaged in building or creating puppets for others. As early as 1965, Mr. Henson was quoted as saying "when you do puppets, you can create the whole show yourself, write it, perform it, direct it, everything. It's a whole thing, a mood. It's a way of saying something." (Pl. Exs. 13 (H02060), 33(c), 34, 38, 86–87; Jane Henson 61–62; Deposition of Jerry Juhl sworn to on Apr. 26, 1993 ("Juhl") 30; Trial Tr.[2] 37–38, 40–41, 54–55, Schube).

5. From the outset of his career, all performances of Muppet puppets have been by Mr. Henson or other Muppet puppeteers trained by Mr. Henson and/or Jim Henson Productions, Inc. Mr. Henson did not permit others to perform his puppets, and Jim Henson Productions, Inc. has consistently enforced that policy. (*Id.*) ("[W]e wouldn't consider divorcing the puppet from the performance. They're too closely connected.")).

6. From as early as 1954, Mr. Henson had a practice of retaining the copyrights in all Muppet puppets, and to date all such copyrights have been retained by him and/or his company, Jim Henson Productions, Inc.

(Deposition of Irwin Russell sworn to on May 24, 1995 ("Russell") 23–26, 43–44, Pretrial Ord. § E ¶ 22; Trial Tr. 45, Schube ("[A]ny muppets that are in those movies or even created for those movies will be and will always be owned by us. That's been our practice throughout the history of the Company and it remains our practice today")).

7. Notwithstanding Mr. Henson's practice of retaining copyright ownership in the Muppet puppets, in the 1950s and 1960s he did not routinely register these copyrights in the Copyright Office. Although a small number of Muppet puppets created in the 1950s and 1960s were registered with the Copyright Office, many Muppets created as early as the mid–50s, including puppets appearing on his Sam and Friends television series, were not registered. (Jane Henson 23–24, Pretrial Ord. § E ¶ 22, Pl.Exs. 4, 12, 89).

*Facts Surrounding Recognition of the Hensons' Work Prior to Their Relationship with the John H. Wilkins Co.*

8. While students at the University of Maryland in the 1950s, Jim and Jane Henson began work on what would later become a puppet-based entertainment empire. (Pl.Ex. 13 (H02044–45, H02048, etc.); Pl.Ex. 45 (¶¶ 3, 11); *JHP, Inc.,* 867 F.Supp. at 177).

9. Commencing sometime about 1954, they adopted the term "Muppet" and "Muppets" as a service mark and as a trademark to identify the puppet characters they created and performed. (Pl.Ex. 45 (¶¶ 4, 5, 49); *JHP, Inc.,* 867 F.Supp. at 177). Today, "Muppets" is a famous mark that continues to identify plaintiffs' particular brand of puppetry—the soft, expressive puppet performed and created by plaintiffs. (Trial Tr. 38, Schube; Pl.Exs. 4, 87–88).

10. The Hensons started gaining notoriety in connection with their performances of Muppet puppets on television in or around the early-to-mid 1950s. (Pl.Ex. 13 (H02044–45, H02048–49, H02052–56, H02060(a)–61, H02068–71), 85).

**2.** Citations in the form "Trial Tr. __, __" refer to pages in the Trial Transcript and identify the witnesses who so testified.

11. In 1955 or 1956, articles in the Washington Post and Times Herald stated that "[b]ig things are ... in the works for Jim Henson and Jane Nebel" and that "NBC producers were impressed with muppets Sam, Kermit, Algernon J. Kumquat, Yorick, Hank and Frank, and Mush Melon." (Pl.Ex. 13; (H02044–45; H02056)). In 1957, reviewers noted that Jim Henson and his Muppets "have been getting considerable attention recently from the networks...." (Pl.Ex. 13 (H02048)).

12. During 1956 and 1957, the Hensons made guest appearances including performances of the Muppet puppets on the Will Rodgers Show, the Steve Allen Show, on Arthur Godfrey Time, and on the Jack Paar Show. (Pl.Ex. 13 (H02050–51, H02055, H02061, H02068–71)).

13. The Hensons subsequently made guest appearances on the Tonight Show and the Jack Paar Show and also appeared on other national television programs, including appearing as guest stars on the Ed Sullivan Show, and as regulars on the Jimmy Dean Show. (See e.g. Pl.Ex. 45 (¶¶ 41 and 42); Pl.Ex. 49 (¶ 20)).

14. Commencing in approximately May, 1955 (before the John H. Wilkins commercials were created) and continuing until approximately December 1961, Jim and Jane Henson, and later their company, Muppets, Inc., regularly performed various Muppet puppets (but not Wilkins and Wontkins) on a local television show entitled "Sam and Friends" which was broadcast in the Washington, D.C. area and which aired twice nightly on WRC–TV, the NBC affiliate in Washington, D.C., once just after the Huntley Brinkley News Hour, and once just prior to the Tonight Show. (See e.g. Pl.Ex. 45 (¶¶ 41 and 42); Pl.Ex. 49 (¶ 20); Pl.Ex. 13; Def.Ex. 46; Jane Henson 10–11, 24, 201–03; Deposition of Regis Cupples sworn to on Apr. 23, 1993 ("Cupples") 13; Juhl 21–22, 30; Deposition of Leslie Asch sworn to on Apr. 30, 1993 ("Asch") 32).

15. Prior to 1957, somewhere between twelve and twenty Muppet puppets had been created. (Jane Henson 23–24).

16. In 1958, "Sam and Friends" was "acclaimed by Washingtonians as the most popular local television attraction" and in February 1958 won an Emmy award for best local entertainment. (Pl .Ex. 13 (H02050–51); Pl. Exs. 45 (¶ 42), 79A and 80A (¶ 1–5)).

17. Mr. Martin Stone, an expert called by defendants, testified to the effect of television appearances on one's reputation, stating that a performer "achieved almost immediately, if not in a few months, a presence and if you stay on long enough, you would be extremely successful." (Trial Tr. 309, Stone).

18. Jim Henson and the "Muppet" puppets were already well known prior to the commencement of their relationship with the John H. Wilkins Company for their "Sam and Friends" show, among other things. (See also (¶¶ 8–17), supra, and J. Henson 23, 201–03).

19. Jim and Jane Henson were earning substantial sums from their performances on Sam and Friends in the mid-to-late 1950s, appearing twice daily, five times a week. (See Pl.Ex. 88 (¶ 2(b))—($370 rate for five performances of 15 minutes or less) × 2 (for 10 performances a week) × 2 (Jim and Jane) × 52 (weeks per year) = $76,960 annual income; § 2(c) = $740 (assuming that the two performances per day were identical, the two performances would be compensated at one and three-quarter times the single rate, yielding $67,340 combined annual income)).

20. The Hensons transferred all of their rights in Wilkins and Wontkins to Muppets, Inc. upon its incorporation in Washington D.C. on November 20, 1958. (Jane Henson 73–75, 182; Pl.Ex. 2).

*Facts Concerning the John H. Wilkins Co.*

21. The John H. Wilkins Company was formed primarily for the purpose of marketing food supplies and related products. (Pl. Ex.23).

22. During the 1950s and 1960s, the John H. Wilkins Company's business consisted primarily of manufacturing and selling its own coffee products. (Hefler 6–7).

23. At all relevant times prior to 1974, the John H. Wilkins Company sold its coffee and tea products substantially exclusively in

two markets: (a) retail stores in the greater Washington, D.C. area (consisting of Baltimore, Washington, Richmond, and Norfolk) and (b) institutional buyers such as hotels and restaurants. By 1974, the John H. Wilkins Company had practically phased out the retail end of its business. (Pl.Ex. 49 (¶ 2); Hefler 6–7; Ashplant 12–13).

*Relationship and Agreements Between the Hensons and the John H. Wilkins Co.*

24. The relationship between the Hensons and the John H. Wilkins Company first developed sometime during the mid–1950s when John H. Wilkins, the founder of the John H. Wilkins Company, saw the Hensons' television show "Sam and Friends" on a local television station and asked Roger Hefler, his right hand-man, to contact them about the possibilities of using their talents for an advertising program to promote the John H. Wilkins Company's coffee product. (Hefler 8; Jane Henson 23; Pl.Ex. 42 (MO1329)).

25. Upon Mr. Wilkins' request, Mr. Hefler contacted the Hensons, and, thereafter, the parties had a number of meetings and discussions culminating in the first of many agreements. (Hefler 8–10, 22).

26. In or about 1957 or 1958, the John H. Wilkins Company introduced a regional advertising campaign to promote retail sales of its Wilkins brand coffee that consisted primarily of the television commercials written and then produced by Jim Henson in which Jim Henson and other puppeteers under his direction performed the Wilkins and Wontkins puppet characters. (Hereinafter, the television commercials produced by the Hensons or their company, Muppets, Inc., for the John H. Wilkins Company will be referred to as the "John H. Wilkins commercials.") (Hefler 10–15, Pl.Exs. 24A; 49 (¶.9)).

27. Over the course of their relationship from around 1957 through the mid-to-late 1960s, the Hensons and their company, Muppets, Inc., and the John H. Wilkins Company had many written and oral agreements. (Hefler 9–10, 14, 18, 19, 53; Jane Henson 141–42, 182–86; *see e.g.*, Pl.Exs. 24(A), (H), (J), (K), (L), (N), 25(D), 45 (¶¶ 80, 87–89, 91)).

28. The documentary records of the parties and their predecessors, however, are in-

complete. (Pl.Ex. 45 (¶¶ 80, 88–89, 91); Hefler 15, 76–77, 94; Jane Henson 181–82; Furey 30–32, 86–95, and Pl.Ex. 59; Ver Standig 29, 43–44 and Pl.Ex. 58; Ashplant 5–6, 81–84 and Pl.Ex. 60; Hatch I 16, 39–40, 43, 112; Deposition of Daniel Abensohn sworn to on Nov. 12, 1992 and Apr. 27, 1993 ("D.Abensohn") 237–38, 243, 246, 411; Deposition of Helen Marmoll sworn to on May 17, 1993 ("Marmoll") 80–81; Deposition of Stanford Berman sworn to on May 21, 1993 ("S.Berman") 45–46, 65; Deposition of John T. Brady sworn to on July 24, 1992 ("Brady") 280–281; Winegar 24–25). Defendant Coffee Associates, Inc. did not produce the originals, signed or unsigned, or copies of any agreements between Jim Henson and Jane Henson or Muppets, Inc. and the John H. Wilkins Company or any of defendants' other alleged predecessors in interest. (Pl. Ex. 45 (¶¶ 80, 85(c)). Neither defendant produced any documents from its respective files that concern communications or the relationship between the Hensons and the John H. Wilkins Company. Other than certain documents produced by Helen Marmoll, plaintiffs produced all of the documents in the case concerning the relationship between the Hensons and the John H. Wilkins Company. (Pl.Ex. 46 (¶¶ 142–61, 163–65)).

29. Mr. Hefler was responsible at the John H. Wilkins Company for its relationship with the Hensons and Muppets, Inc. and handled most of the correspondence relating to them on behalf of the John H. Wilkins Company. (Hefler 10).

30. Of all the persons who have been deposed in this case, Roger Hefler and Jane Henson are the only persons with first-hand knowledge of the purpose of the agreements between the Hensons and/or Muppets Inc. and the John H. Wilkins Company. (Hefler 10–14, 43; Jane Henson 151–54, 162–71, 183–86, 192–95; D. Abensohn 245–49; Marmol 30, 41, 49, 59–60, 81; Winegar 24–25, 121; Ver Standig 21–30, 32–35, 60–61; Ashplant 99–100; Furey 14–31, 37–40; 63–64, 69, 73, 79–80; Deposition of Seymour Abensohn sworn to on Apr. 22, 1993 ("S.Abensohn") 39, 44, 70–72, 132–33, S. Berman 9–10, 87; Hatch II 36; Brady 223–30, 273, 279–80; Cupples 10–11, 27, 120–22; 144–45). Further, of all such

persons, including Mrs. Henson, only Mr. Hefler has first-hand knowledge of the terms of such agreement(s). (Hefler 10–11; Jane Henson 145–46, 151–52). Every other witness in the case who had any knowledge of dealings between the Hensons and the John H. Wilkins Company (including defendants' witnesses) identified Mr. Hefler as the individual who would know best the terms of the agreements between the parties. (Hefler 4–6; Furey 16–17; Jane Henson 139–140, 159, 168; Hatch I 114–15, 119; Hatch II 36; Ver Standig 61; Pl.Ex. 42 (M001325)). In their answers to plaintiffs' interrogatories defendants also identified Mr. Hefler as a person who would know the terms of the agreements. (Pl.Ex. 50 (¶¶ 3–4)).

31. However, in the course of defendants' investigation of their asserted rights with respect to Wilkins and Wontkins, neither defendants nor anyone acting under their supervision or authority or on their behalf contacted Roger Hefler and asked him: (a) what the terms were of any agreements between the John H. Wilkins Company and the Hensons and/or Muppets Inc., or (b) if the Hensons had transferred any copyright rights in Wilkins and Wontkins to the John H. Wilkins Company. (Pl.Ex. 46 (¶ 170)).

32. The purpose and intention of the Hensons and the John H. Wilkins Company with respect to all their agreements during their collaboration was as follows: (1) the Hensons would create television commercials in which they would perform certain "Muppets", here the Wilkins and Wontkins puppet characters; (2) the John H. Wilkins Company would have the exclusive rights to use the puppets in connection with its advertising campaign to promote its coffee product to the retail trade in its trading market—the greater Washington area—for the duration of the advertising campaign; and (3) the rights granted to the John H. Wilkins Company with respect to Wilkins and Wontkins were terminable at the conclusion of the advertising campaign. (Hefler 10–13, 20–36; Jane Henson 151–54, 162–71, 183–86, 192–93; Pl. Ex. 45 (¶¶ 20, 48)).

33. An integral part of the agreements between the John H. Wilkins Company and Mr. Henson was that only Mr. Henson or someone under his supervision would perform his Muppet puppets and that such performances would always be in the context of a commercial entirely created by him. Similarly, any ancillary uses of two- or three-dimensional depictions of the puppets would be part of the John H. Wilkins Company's advertising campaign, in its region, and would be subject to Mr. Henson's creative control and consent. In other words, irrespective of the question of copyright ownership, under the parties' agreement, (i) the John H. Wilkins Company only had the right to use the characters in its region to promote Wilkins Coffee; and (ii) the John H. Wilkins Company never had the right to use these puppets or characters separate and apart from Mr. Henson's creative services and control. (*Id.* and Pl.Exs. 33(c), 34, 38).

34. The initial agreement between the John H. Wilkins Company and the Hensons was memorialized in a letter dated November 14, 1957 from Jim Henson to M. Belmont Ver Standig, Inc., which at the time was the John H. Wilkins Company's advertising agency. In that letter, Mr. Henson stated "This includes creation of situations, characters, voices, sets and the exclusive film commercial rights to the Muppets while these films are being used on the air". (Pl.Ex.24(a); Hefler 22–24; Jane Henson 144–48).

35. By the time of the September 16, 1958 Assignment (discussed *infra*), the John H. Wilkins advertising campaign had already been running for approximately 10 months. Roughly 50 of the John H. Wilkins commercials had been created, and they were very popular. By that point, if not earlier, the John H. Wilkins Company was dependent upon Mr. Henson's talents to continue the campaign and could not replace him with anyone else. (Hefler 31–32; Pl.Exs. 5, 24(b) and (c); Pl.Ex. 13 (HOO749); *see also* Pl.Ex. 14A).

36. Jim Henson and/or Jane Henson and/or Muppets, Inc. did not provide puppets separately, but instead provided, in combination, all the creative services necessary to the entire filming of the John H. Wilkins commercials, including the storyboards, scripts, sets, special effects, costumes, art work, props (other than actual Wilkins Coffee prod-

ucts), directorial services, production services, and performers. This was consistent with Mr. Henson's way of expressing his art form. (Jane Henson 133, 148; Pls.Ex. 3, 24A; Hefler 8, 10, 12–13, 22–24).

37. The Wilkins and Wontkins puppets had a strong physical resemblance to the then-existing "Muppet" puppets (compare Pl. Exs. 4, p. 37, 16 with Pl.Ex. 8) but were built after Jim Henson created the storyboards for the John H. Wilkins commercials. (Pl.Ex. 3, Jane Henson 21).

38. During the 1950s and 1960s, the John H. Wilkins commercials were broadcast in the greater Washington, D.C. area only. (Pl. Ex. 49 (¶ 10); Hefler 24, 29–31, 36).

39. As part of the John H. Wilkins Company's advertising campaign, beginning in or about late December 1958 and ending sometime in early 1959, for approximately three months, depictions of the Wilkins and Wontkins characters appeared in local Washington, D.C. newspaper advertisements promoting Wilkins brand coffee, and miniaturized rubber or vinyl figurine adaptations of the Wilkins and Wontkins puppets (called "premiums") were offered and distributed by the John H. Wilkins Company to its retail customers in the greater Washington, D.C. area. Also during this three-month period, an offer for the premiums, depicting them, was placed on ·the lid of the Wilkins Coffee cans. Although the premiums were not released until late December, 1958 (Pl.Ex.28(d)), their introduction was anticipated in late August, 1958 (Pl.Ex.27(c)), which coincides with the timing of the September 16, 1958 Assignment. (Pl.Ex. 45 (¶¶ 97, 98); Pl.Ex. 49 (¶¶ 12 and 13); Pl.Ex. 51 (¶ 34); Hefler 96–97). Other than the foregoing, no depictions of the Wilkins and Wontkins premiums or puppets, or their character names, were used on Wilkins coffee cans or other product containers.

40. The Wilkins and Wontkins premiums, which were approved by Jim Henson and based upon drawings created by him, bore copyright and patent pending notices in the name of the John H. Wilkins Company with a date of 1958. (Pretrial Ord. § E (¶¶ 46, 53); Hefler 78, 83, 95; Pl.Ex. 51 (¶ 43); Def.Exs. 8, 9). At least 65 of the John H. Wilkins commercials also bore a copyright notice in the name of the John H. Wilkins Company. (Pl.Ex.6). I find that the parties were concerned about using the proper copyright notice to protect the exclusive rights being enjoyed by the John H. Wilkins Company, for their mutual benefit, and with respect to the premiums. (Pl.Exs.25(B), 26H, 27(F); Def.Ex. 43). I also find that the John H. Wilkins Company, as the advertiser, had sound business reasons for wanting its own name in the copyright notice. (*Id.* and Trial Tr. 275–76, Perle).

41. Mr. Henson was paid a royalty on sales of the premiums (Pl.Exs.27(f) last ¶, 28(h), 31(c)). As early as 1962, in connection with premiums for out-of-town advertisers, Muppets, Inc. handled these transactions on its own with no involvement of, or payment to, the John H. Wilkins Company. (Pl. Ex.27(j); Def.Exs. 106, 109; Hefler 87–89).

42. The John H. Wilkins Company never intended to use on its own and never used the Wilkins and Wontkins puppets at all—the actual puppets were retained by the Hensons and used by them alone in connection with their performances in the John H. Wilkins commercials and the out-of-town commercials. (Pretrial Ord. § E (¶¶ 9, 10, 28)). The John H. Wilkins Company never intended to and never did use the commercials or the premiums in any manner other than to promote its coffee and tea products in the retail trading market in the greater Washington D.C. area. (Hefler 6–7, 13, 20, 21, 24, 28–29; Pl.Ex. 45 (¶¶ 20, 47, 92, 93, 103)).

43. I find that the John H. Wilkins Company did not intend by its agreements with Mr. Henson to acquire characters which were to become corporate symbols or trademarks to identify or be associated with Wilkins brand coffee. In the seven years during which the commercials aired, on and off, the character names were not promoted to the public, nor were they used in any of the commercials. Nor were they used as trademarks. (Pl.Exs. 7, 13 (H00751); Def.Exs. 47, 48; *JHP, Inc.*, 867 F.Supp. at 82–83). The character names were so unimportant that they are not even mentioned in the initial letter agreement in November 1957, or even

in the September 16, 1958 Assignment, where they are referred to as "certain Muppets." (Pl.Ex.24(a); Def.Ex. 13). Further, Mr. Henson's scripts for other advertisers used different names for the same characters. (Pl.Exs. 94, 95; *see also* Pl.Exs. 26I, M, and 27C). Instead, I find that the John H. Wilkins Company intended by its agreements with Mr. Henson to acquire his talents as an entertainer, so that commercials could be created to draw attention to its coffee product. The John H. Wilkins Company understood that Mr. Henson's Muppet puppets and all copyrights therein would remain with him when the commercial campaign was over.

44. The John H. Wilkins Company never believed that it obtained any copyright rights with respect to the Wilkins and Wontkins puppets, other than to use Jim Henson's commercials and the premiums and print advertisements containing depictions thereof to promote its coffee product to the retail trade in its trading market, the greater Washington D.C. area, for the duration of its advertising campaign. (Hefler 20–21, 24, 25, 74–75).

45. The John H. Wilkins Company never paid the Hensons or their company for a transfer or assignment of all their rights in Wilkins and Wontkins. (Hefler 41; Pl.Ex. 40A). Based on the expert testimony of Lincoln Diamant, which I find persuasive, the amounts paid to the Hensons and/or Muppets, Inc. in connection with the production of the John H. Wilkins Company commercials were low for the services rendered and do not leave any room for a buy-out of all rights, which would have cost a substantial amount even in those years. (Trial Tr. 101–105). The testimony of Mr. Stone, defendants' expert, is not to the contrary; he testified that his company bought out a puppeteer's copyright in 1950 for $250,000. (Trial Tr. 314, 331, Stone).

46. The M. Belmont Ver Standig Advertising Agency produced the John H. Wilkins Company commercials at various periods of time during the years commencing sometime in late 1957 or 1958 until on or about October 1, 1961, and thereafter Muppets, Inc. produced such commercials through and includ-

ing at least 1965, but not later than 1968. (Pl.Exs. 24A, 24G, 45 (¶ 90); Furey 65–66; Hefler 74–75, 85; Henson 124–25). Mr. Henson and Muppets, Inc. had sole creative control over these commercials.

47. In light of the fact that while the John H. Wilkins Company commercials were on the air Mr. Henson had given that company "the exclusive film commercial rights to the Muppets," (Pl.Ex.24(a)), and in light of the fact that the John H. Wilkins Company referred non-competing advertiser "clients" to Mr. Henson, I find that the John H. Wilkins Company agreed with Muppets, Inc. that in the event that Muppets, Inc. produced commercials featuring performances of Wilkins and Wontkins for other advertisers outside of the John H. Wilkins Company's market area, Muppets, Inc. was to pay the John H. Wilkins Company a commission for such commercials. (Pl.Ex. 44 (¶ 76); Hefler 41–56; Henson 50–51; 186–89).

48. I also find, based on Mr. Hefler's testimony, which I find both credible and highly persuasive, that the commission paid to the John H. Wilkins Company with respect to out-of-town commercials was not, as defendants contend, a license fee or a royalty payment because the John H. Wilkins Company was the copyright owner of Wilkins and Wontkins. To the contrary, it is clear from his testimony and corroborating documents (Pl.Ex.24J) that this commission was paid for all Muppet puppets used in other commercials, including such puppets as Scoop and Skip, the copyrights to which, defendants concede, were always to remain with Mr. Henson.

49. The out-of-town commercials were produced pursuant to agreements between Muppets, Inc. and the advertisers in question (and/or their respective advertising agencies). The John H. Wilkins Company had no contract with the advertisers, and there is no evidence that its consent was required, sought or given. (Pl.Ex. 45 (¶ 77)). Initially, the Hensons worked out their deal with the other advertisers through the Belmont Ver Standig Agency, with whom Mr. Henson had made a separate agreement (which agreement he bought out for $5,000 as of October 1, 1961) and thereafter through Muppets,

Inc. (Hefler 42, 86–90, 92–93). Thus, during the 1958–1961 period, when the Ver Standig Agency was still involved in the out-of-town commercials, the Ver Standig Agency first paid the Hensons, and then, after payment of expenses, remitted to the John H. Wilkins Company its commission, which was a share of profits, and retained the remainder as its fee. After October, 1961, when the Ver Standig Agency was no longer involved, Muppets, Inc. paid the John H. Wilkins Company a 20% commission directly. On this record, I find that the Ver Standig Agency and the John H. Wilkins Company never had a joint venture to sell Mr. Henson's commercial films.

50. As of October 1, 1961, if not earlier, it was agreed that Mr. Henson's obligation to pay commissions to the John H. Wilkins Company for Mr. Henson's out-of-town commercials would end two years after the John H. Wilkins Company ceased using the John H. Wilkins Company commercials. (Pl. Ex.24J).

51. The agreements between Muppets, Inc. and the companies in question (and/or their respective advertising agencies) generally granted the companies the exclusive right in their trading area to broadcast the commercials in which the Wilkins and Wontkins puppet characters were performed by the Hensons. (*See, e.g.,* Pl.Exs. 26A, 27I, 29, 30A, 31A, 32B, 36B, 38).

52. The John H. Wilkins Company had no involvement in, exercised no control over and possessed no right to control the commercials or the quality of the goods and/or services offered by the other advertisers who used commercials featuring performances of Wilkins and Wontkins. As between the John H. Wilkins Company and Mr. Henson, Mr. Henson and his company had sole control, including creative control, over these commercials. (Hefler 25, 89, 92–93; Pl.Exs. 26(A, B), 27(A, B, I), 28A, 29, 30(A), 31(A), 32(B), 38, 36(A–B)).

53. Defendants' assertion that the John H. Wilkins Company acquired all copyright rights in Wilkins and Wontkins from the Hensons is based exclusively on the transfer purportedly effectuated by the September 16, 1958 Assignment; defendants admit that they know of no other documents or evidence which they contend constitutes a transfer of copyright rights in Wilkins and Wontkins from the Hensons and/or Muppets Inc., the Hensons' company, to the John H. Wilkins Company. (Pl.Ex. 46 (¶¶ 125–28)).

54. Defendants also contend that certain patent rights in Wilkins and Wontkins were assigned by the Hensons to the John H. Wilkins Company pursuant to an assignment executed on October 16, 1958 (the "October 16 Assignment"). (Pl.Ex. 51 (¶ 24)).

55. Documentary evidence, oral testimony, conduct of the parties and the surrounding circumstances, and evidence of custom and practice establish that the September 16, 1958 Assignment was not the complete agreement between the parties and was not intended to transfer all rights, including copyright rights, in the Wilkins and Wontkins puppets in perpetuity to the John H. Wilkins Company.

56. The September 16, 1958 Assignment and October 16, 1958 Assignment were entered into shortly prior to the sale and distribution of the Wilkins and Wontkins premiums, around the time the Hensons and/or Muppets, Inc. began performing the Wilkins and Wontkins puppets to promote the products of companies other than the John H. Wilkins Company and around the time when such companies began expressing interest in distributing premiums to promote their products. (*JHP, Inc.* at 178; Pl.Exs. 25A–B; 26B–K; 27A–F; 28A–G; 29; 45 (¶ 98)).

57. Jane Henson believes that the September 16, 1958 Assignment related to the premiums and protecting rights against third parties. (Jane Henson 155–56, 172–74, 207–08).

58. The John H. Wilkins Company was represented by intellectual property counsel during, but not solely in 1958. (Pl.Ex. 47 (¶ 195), Pl.Ex. 42 (M01090–1424); Hefler 38; Furey 58–60).

59. The September 16, 1958 Assignment was drafted by attorneys for the John H. Wilkins Company. (Trial Tr. 186, Olsson; Trial Tr. 270–71, Perle; Trial Tr. 486, Baumgarten; Hefler 91; Pretrial Ord. § E ¶¶ 31

and 39). I find it most probable that the September 16, 1958 Assignment was recorded by attorneys for the John H. Wilkins Company. (Trial Tr. 420, 488–489, Baumgarten). Further, there is no evidence that Mr. Henson was notified of such recordation.

60. Although the parties' records are incomplete, and there is no documentary evidence other than the document itself as to who prepared the 1958 Assignment, documents produced by Helen Marmoll show that during the 1950s and 1960s, Mr. Hefler regularly exchanged correspondence with the law firm of Scrivener Parker Scrivener and Clarke, an intellectual property law firm. (Pl.Ex. 42 (M01090–1424); Hefler 38; Furey 58–59).

61. With respect to Mr. Henson's agreements with the John H. Wilkins Company, Mr. Henson did his own negotiating and never had anyone else with him. (Hefler 92, 95).

62. An attorney represented the Hensons in connection with the incorporation of Muppets, Inc., but there is no evidence that any other attorneys were representing them at that time. (Jane Henson 161–62).

63. Documents produced in this case that refer to copyright ownership of Wilkins and Wontkins reflect that the John H. Wilkins Company was actively interested in maintaining copy-right protection and/or in preventing copyright infringement. (Pl.Exs.25(B), 26(H), 27(F), 27(G), 28(G), 31(B), 42 (see, e.g., M001097, M001154–55, M001212, M001309, M001334, M001338; see also, M001318–22); Def.Exs. 31, 41, 42, 43, 72).

*Business Climate of the Relevant Time Period*

*Expert Testimony with respect to Business Practices*

64. Plaintiffs' expert Lincoln Diamant was qualified as an expert in the broadcast commercial industry in the 1950s and 1960s. As a television commercial producer for such leading advertising agencies as McCann–Erickson, Inc., Ogilvy & Mather and Grey Advertising, Inc., among others, and eventually for his own company, Spots Alive, from 1949 through 1992, Mr. Diamant watched and directly participated in the evolution and development of the customs and practices of the television commercial industry and had extensive personal involvement in negotiating and administering talent agreements and the applicable talent union contracts. (Trial Tr. 63–66, Diamant; Pl.Ex. 73).

65. Defendants did not seek to qualify Martin Stone as an expert witness in the television commercial industry. Rather, he was qualified as an expert in the licensing industry, which is an industry devoted to the merchandising of names, fictional characters, including puppets and personalities. (Trial Tr. 320–21, 329, Stone). I find Mr. Stone's testimony to be entitled to less weight and, therefore, less persuasive than Mr. Diamant's because, in the 1950s, there was no significant overlap between the television advertising industry and the licensing industry, and neither the John H. Wilkins Company nor Jim Henson was in the licensing industry at that time. (Trial Tr. 71, Diamant; Trial Tr. 330–31, Stone). Moreover, the licensing industry was just starting out in the 1950s, and few realized the potential for exploiting their works in this manner. (Trial Tr. 308, 328–29, 365–67, Stone). In the 1950s and 1960s, it was not common for advertisers to license elements of their commercials to third parties. (Trial Tr. 71, Diamant; Trial Tr. 365–67, Stone).

*Agreements in the Television Commercial Industry*

66. Roger Hefler's testimony—that the only rights that the John H. Wilkins Company obtained in the Wilkins and Wontkins puppets were the exclusive rights to use the puppets in connection with its advertising campaign to promote its products in its region for the life of its advertising campaign and that whatever rights were granted to the company with respect to the puppets were terminable at the conclusion of the advertising campaign—is fully consistent with the custom and practice of the television advertising industry in the 1950s and 1960s. (Trial Tr. 107, Diamant; Pl.Ex. 83).

67. In the late 1950s, the television commercial industry was a simpler business than it is today, and transactions were much less frequently documented on paper. A hand-

shake often sealed an agreement, and written contracts were generally simpler agreements. Much of the business was built on familiarity and trust. (Trial Tr. 67–69, Diamant; Trial Tr. 313 ("[T]hings were done very quickly ... There were no contracts. There were words of mouth....."), Stone; Pl.Ex. 83).

68. Even in the 1950s, however, an agreement—whether oral, written or a combination of both—between a television advertiser or its advertising agency on the one hand and the "talent" that appeared in or created copyrightable material for television commercials for that advertiser on the other hand would normally address numerous basic points. Because it fails to address so many of the points that would normally be covered by such an agreement, I find that the September 16, 1958 Assignment signed by Jim Henson and Jane Nebel certainly is not the complete agreement between the Hensons and the John H. Wilkins Company regarding the Wilkins and Wontkins commercials. (Trial Tr. 90–92, 105–106, Diamant).

69. TV commercials are temporary tools for temporary campaigns, and long-running commercials are the exception, not the rule. In the late 1950's, as today, advertisers and advertising agencies worked from the premises that (a) advertising campaigns have lives of limited duration and are generally targeted to particular audiences in a specific geographic area through specific media, and (b) they purchased only the rights required to effectuate the campaign. (Trial Tr. 69–71, Diamant).

70. While the advertiser customarily owned whatever elements of its commercials that were created by the creative department of its advertising agency, it did not customarily own the elements of its commercials created by outside people. (Trial Tr. 72, Diamant).

71. In the late 1950s, performers supplying creative materials for commercials customarily licensed those materials for specified uses and retained ownership of their materials. This was particularly true of a creator such as a puppeteer who supplied such materials as part of his performance. Advertisers customarily obtained only a right to use the elements of their television commercials for a set period of time in a specified geographic area. It was not, however, the custom and practice of television advertisers to obtain perpetual rights in material created by an independent creator/performer for use in a television commercial. Most advertisers had no need for a complete grant of all rights in the elements of their commercials and were unwilling to pay the higher price that would have been required for such a grant. (Trial Tr. 69–71, 90–96, 111, Diamant; Pl.Exs. 70A, 70B, 88).

72. Agreements for the production of television commercials in the late 1950s were almost invariably structured as grants of limited rights for limited periods of time. In the case of talent, the advertiser (or its agency) customarily bought the right to use a particular performance for a specified period of time in a specified geographic area, with rights to renew. Puppeteers were treated no differently from other performers in this respect; when puppeteers created and performed their own puppets, the advertiser bought rights to broadcast the performance, not rights in the puppets. It was not customary for puppeteers to part with all rights in their puppets in the 1950s and 1960s, because puppeteers generally continue to and expect to perform their puppets in subsequent performances. For example, Frank Paris, the puppeteer who created the original Howdy Doody, Paul Winchell, the ventriloquist who performed Jerry Mahoney, and Shari Lewis, the puppeteer who performed Lamb Chop, Hush Puppy and other characters, all retained ownership of their characters and continued performing them in different contexts. Defendants' expert, Mr. Stone, was unable to identify any example of any outright sales of all rights in a puppet character (including ventriloquists' dummies) to an advertiser or an ad agency in the 1950s or 1960s. (Trial Tr. 72–73, 80–83, 99–101, Diamant; Trial Tr. 312–13, 341, 347–48, 361, Stone; Trial Tr. 432, Baumgarten; Pl.Exs. 70A, 70B, 88).

73. Mr. Stone confirmed that it was absolutely not customary for copyright owners to transfer all copyright rights in characters in the 1950s and 1960s. (Trial Tr. 334–35,

Stone). For example, when Mr. Stone licensed characters, advertisers "never, never received rights from us other than for the particular promotion." (Trial Tr. 322, Stone; *see also* Trial Tr. 339–40, 341–43, Stone).

74. There was no established custom or practice with respect to who would own the rights in a character that was created specifically for advertising where the character had in its name the name of the company for which it was created. (Trial Tr. 373, Stone; *see also* Trial Tr. 203, Olsson).

*The AFTRA and SAG Codes*

75. Both the American Federation of Television and Radio Artists ("AFTRA") and the Screen Actors Guild ("SAG") had collective bargaining agreements, or codes, governing their members' performances in television commercials during the relevant time period. The SAG and AFTRA codes were based upon and reflected industry custom and practice in the television advertising industry. (Trial Tr. 74–78, Diamant; Pl.Exs. 70A, 70B, 88).

76. The AFTRA and SAG codes establish a maximum period of use and reuse for television commercials (generally a year and a half from the date of first use) and give a performer the right to veto further use of a commercial in which he or she appears after the expiration of such maximum period. (Pl. Exs.70(a) (H03863, H03891, H03928–29, H03987, H04052), 70(b) (H03646, H03686, H03737, H03798)).

77. Prior to November 16, 1958, the AFTRA code governing television commercials was the 1956–58 AFTRA Code of Fair Practice for Network Television Broadcasting (the "1956 AFTRA Code"). Television commercials were subsumed under that code for the historical reason that originally single advertisers sponsored entire programs. (Trial Tr. 79–80, 83–84, Diamant; *see, e.g.,* Pl.Ex. 88 (§§ 20, 29, 44)).

78. The 1956 AFTRA Code was in effect from November 16, 1956 to November 15, 1958, inclusive, and covers the John H. Wilkins commercials that were created during the time period that it was in effect. (Trial Tr. 85, 88–89, Diamant; Pl.Ex. 88(§ 1)).

79. Although the title of the 1956 AFTRA Code refers to "network television," the code defines a "network television program" as one which is broadcast over two or more television stations (Pl.Ex. 88 (§ 71)), and the John H. Wilkins commercials were broadcast over two or more television stations. (Pl. Exs.24B, 25C–E). There was no separate AFTRA Code in 1956–58 that covered the local Washington, D.C. market, and any discrepancy between the minimum wages established by the 1956 AFTRA Code and the wages paid to the Hensons can be explained by the fact that AFTRA could modify the minimum wages by written consent. (*See* Pl.Ex. 88, (§§ 88(b), 76, 77)).

80. Contemporaneous correspondence reflects the fact that Jim Henson and the John H. Wilkins Company, and/or its advertising agency, the M. Belmont Ver Standig Agency, agreed to be bound by the 1956 AFTRA Code with respect to the Wilkins and Wontkins commercials produced prior to November 15, 1958. (Trial Tr. 89, Diamant; Pl.Exs. 24(a)–(c), 27(a), 27(d), 28(a), 40(a), 88 (§§ 66, 67)).

81. All individual contracts between AFTRA members and producers who either signed or signified their intention to abide by the 1956 AFTRA Code were subject to the terms of the 1956 AFTRA Code, and, in the case of any inconsistency, the 1956 AFTRA Code prevailed. (Pl.Ex. 88 (§§ 66–67)).

82. The 1956 AFTRA Code provides that a producer and performer may not contract for services outside the scope of the Code in any manner that conflicts with that Code. (*E.g.,* Pl.Ex. 88 (§§ 57, 66, 67, 68)). It further provides that the acceptance by an AFTRA member of payment or other consideration for any work or services under the 1956–58 AFTRA Code shall not be deemed a waiver by such AFTRA member or a release or discharge of his or her contractual rights. (Pl.Ex. 88 (§ 64)). Indeed, the 1956 AFTRA agreement provides that "[r]eleases, discharges, notations on checks, cancellations, etc., and similar devices which may operate as waivers or releases shall be null and void to the extent provided for above unless AFTRA's prior written approval is first had and obtained." (*Id.*).

83. The 1956 AFTRA Code provides that every engagement for a single television broadcast or for multiple television broadcasts within one calendar week shall, if in writing, be on a specified standard form of contract, and, if oral, shall be deemed to be on such standard form. Additions to the standard form must be more favorable to the performer than, or not inconsistent with, the express provisions of the standard form contract. (Trial Tr. 91, Diamant; Pl.Ex. 88 (§ 68)).

84. The 1956 AFTRA Code defines "materials" as "any materials, ideas, creations, and properties" and provides as follows:

> If this agreement requires, as an express additional provision, that Performer furnish materials (herein called 'required materials') in connection with his performance hereunder, Performer shall submit such required materials to Producer at such time prior to performance thereof as may be reasonably designated by Producer, and such required material shall, as between Producer and Performer, unless otherwise expressly provided in this agreement under the heading 'Additions', be and remain the property of Performer.

AFTRA required disclosure of agreements between producers and performers whereby the producer obtained ownership of required materials furnished by the performer on the Standard AFTRA Engagement Contract in order to protect performers from exploitation and overreaching by producers. (Trial Tr. 91–95, Diamant; Pl.Ex. 88 (§ 68, item 2(b))). There is no evidence that any such disclosure was made in connection with the John H. Wilkins commercials.

*The Compensation Paid to the Hensons*

85. The amounts that were paid to the Hensons for their work on the John H. Wilkins commercials in 1957 and 1958 are low for the various services they provided, which included supplying the John H. Wilkins Company with the talent for the commercials consisting of at least two puppeteers, the creative idea, the copywriting and the story-board, the set and costume design, the use of two original puppets and the exclusive film commercial rights to the Muppets for a period of time. If an advertiser wanted to acquire all rights in a character created by an independent creator for use in a television commercial in the late 1950s, it would customarily pay a large sum for such rights. (Trial Tr. 100–105, 127, Diamant; Trial Tr. 314, 331, 340, 370–71, Stone; Pl.Exs. 24(a)–(d), 40(a), (b)).

86. The SAG codes in effect in the 1950s distinguished between situations in which advertisers owned the puppet and situations in which the puppeteer owned the puppet. If the performer owned the puppet, the performer would receive on camera reuse payments, whereas if the sponsor owned the puppets, the performer would receive off camera reuse payments if he spoke, and no reuse payments if he did not speak. Those provisions reflected industry custom and practice at the time, and were later adopted by AFTRA. (Trial Tr. 131–32, Diamant; Pl. Exs. 70A (H03863, H03892, H03932, H03990–91, H04059–60), 70B (H03736, H03797)).

87. Jim Henson received on camera reuse payments for his performances of Wilkins and Wontkins from the John H. Wilkins Company. (Pl.Exs.27(a), 27(d) and 28(a); Pretrial Ord. § E, ¶ 28).

*Practices of Copyright Lawyers in the 1950s and 1960s*

*Qualifications of Copyright Law Experts*

88. Defendants' copyright expert Paul Baumgarten was not a member of the copyright bar in 1958. As Mr. Baumgarten testified: "I wasn't really around this business in the fifties. I can speak better probably in the late sixties and the early seventies." (Trial Tr. 470, Baumgarten). He did not speak to others before formulating his opinion, nor did he rely on any of the literature he reviewed in formulating his opinion. (Def.Ex. 252, Trial Tr. 423, 428–29, 470, Baumgarten).

89. In contrast, plaintiffs' experts E. Gabriel Perle [3] and Harry R. Olsson, Jr. were

---

3. Mr. Perle's qualifications are set out in *Playboy Enterprises, Inc. v. Dumas,* 831 F.Supp. 295, 304 (S.D.N.Y.1993).

active members of the copyright bar in the 1950s. Mr. Baumgarten acknowledged that Mr. Perle is one of the recognized experts in the book and periodical publishing fields and that Mr. Olsson is a very well-respected lawyer in the audiovisual fields. (Trial Tr. 138–49, Olsson; Trial Tr. 237–48, Perle; Trial Tr. 432, Baumgarten; Pl.Exs. 34, 75).

*Background*

90. Copyright issues in the television commercial field are similar to issues in other fields. Television commercials fell into the motion pictures category of copyrightable works under the 1909 Copyright Act. (Trial Tr. 149–51, Olsson; Trial Tr. 430, Baumgarten).

91. In the 1950s and 1960s, copyright practitioners, owners and users operated under three artificial but rigid constraints imposed by the 1909 Copyright Act:

(a) a dual system of copyright protection. Common law copyright protection existed from creation of a work until its "publication." Publication triggered the loss of common law copyright and the opportunity to obtain statutory copyright protection, which (with certain limited exceptions) applied only to published works;

(b) an inflexible statutory requirement that a copyright notice, including the name of the copyright proprietor, be affixed to each copy of a published work. Publication of a work by or under the authority of the copyright proprietor without a proper notice, such as a notice in the name of an exclusive licensee rather than the proprietor, was "divestive;" the result was forfeiture of the copyright, and the work entered the public domain. Under the 1909 Copyright Act, there were at times substantial questions as to what constituted publication; and

(c) copyright was regarded as an indivisible and single bundle of rights. The individual rights comprising that bundle could not be separately owned. Thus, even an exclusive licensee of commercially important rights could not sue to enjoin or collect damages for infringement of that licensee's rights.

These three constraints created substantial risks for copyright owners and users and led to the utilization of artificial and technical mechanisms to avoid those risks.[4] (Trial Tr. 152–54, 162–64, 174–76, Olsson; Trial Tr. 250–52, Perle).

92. The doctrine of indivisible copyright did not reflect commercial reality; for example, authors routinely sold magazine, book and motion picture rights to different buyers. However, a grant of anything less than all rights was treated as a mere license under the law. (Trial Tr. 151–57, 161, 165–69, Olsson).

93. Business people and lawyers dealing in copyright issues did not always draw the distinction between licenses and assignments of copyrights under the 1909 Act with precision. For example, although under the 1909 Act, an assignment was supposed to be an assignment of all rights under copyright, Mr. Baumgarten labeled licenses as "assignments" in his practice and, in his testimony, interchanged assignments of rights under copyright with licenses. (Trial Tr. 162–64, Olsson; Trial Tr. 436, 443–45, Baumgarten).

94. The distinction between a copyright assignment and a copyright license was an extremely significant one to the copyright lawyers and users in the 1950s. A copyright proprietor who had been assigned all copyright rights enjoyed a number of significant benefits that a mere licensee did not. (Trial Tr. 162–64, Olsson).

95. Under the 1909 Act, the name of the copyright proprietor had to be used in the copyright notice affixed to the work, and

---

4. These three constraints were of prime concern among copyright lawyers during the general revision of the 1909 Copyright Act which began in 1955 and culminated in the enactment of the Copyright Act of 1976, which became effective on January 1, 1978. All three were eliminated or substantially changed by the 1976 revision: common law protection was abolished for all works created after January 1, 1978; improper copyright notices could be cured; and the owner of any particular exclusive right under copyright became a copyright proprietor with the ability itself to defend and enforce that right. (Trial Tr. 161–62, Olsson; Trial Tr. 254–55, Perle). Messrs. Perle and Olsson were members of the Committee charged with revision of the copyright laws.

inquiries about the work would often be directed to the person named in the notice. The copyright proprietor could register the copyright (assuming the statutory formalities had been met) and sue in its own name for infringement without joining anyone else as a plaintiff. These statutory benefits were important ones to copyright users who wished to protect their rights against infringers and protect their investments. Moreover, failure to comply with the statutory formalities, such as omission of the copyright notice or the use of the wrong name in the notice, could result in the work's falling into the public domain. A user with a substantial interest in a copyrighted work would want to make sure the statutory formalities were satisfied in order to preserve the value of its rights. (Trial Tr. 164–65, Olsson).

*Use of Short Form Assignments*

96. In commercial copyright transactions, an assignment is rarely a stand-alone document. Typically an assignment is made as part of a larger agreement or series of agreements. That was true in the late 1950s and remains true today. (Trial Tr. 171, Olsson; Trial Tr. 265, Perle; Trial Tr. 408, 416–17, 434–35, Baumgarten).

97. Short form assignments were used in a number of industries under the 1909 Copyright Act, including the motion picture and television industries. (Trial Tr. 170–71, Olsson; Trial Tr. 440, Baumgarten).

98. In the late 1950s, copyright lawyers often prepared short form assignment documents for recordation with the Copyright Office which simply stated that the author transferred all rights under copyright to the user. The details of the parties' business deal were not reflected in the short form assignment; rather they were addressed in a separate agreement or understanding between the parties which governed their relationship. (Trial Tr. 343–47, Stone; Trial Tr. 167–69, Olsson; Trial Tr. 259–60, Perle; Trial Tr. 435–36, 441, Baumgarten).

99. Under the 1909 Copyright Act, in cases where a short form assignment and a longer agreement or understanding were used, the longer agreement or understanding controlled as between the parties. The short form assignment was basically a notice document for recordation in the Copyright Office. (Trial Tr. 169, 171–73, Olsson; Trial Tr. 264, Perle; Trial Tr. 435–36, 441, Baumgarten).

100. In the 1950s and 1960s, there was no legal requirement for a short form assignment to cross-reference the separate agreement or understanding between the parties. Sometimes the short form referenced the separate agreement or understanding but sometimes it did not. There were many different forms of short form assignment. (Trial Tr. 259–60, Perle; Trial Tr. 409, 441, 442, 451, Baumgarten).

101. At times, the separate agreement between the parties contained limitations or conditions upon the assignor's right to exploit the work that were not evident from the face of the short-form assignment document alone. Such limitations could include an undertaking to retransfer, an automatic reversion or a limitation on the length of time during which the rights were transferred. (Trial Tr. 164–70, Olsson; Trial Tr. 261–62, Perle; Trial Tr. 441, 446–49, Baumgarten).

102. Sometimes, the so-called short-form assignment was merely a license of certain rights under copyright. Mr. Baumgarten labeled transfers of less than all rights under copyright as "assignments" because "if it had the word 'license' on it, the Copyright Office would have thrown it back." (Trial Tr. 400, 436, Baumgarten).

*Use of the Assignment/Reassignment Tool*

103. In the 1950s and 1960s, short form assignments were sometimes accompanied by a separate agreement or understanding that the rights granted would revert or be reassigned to the assignor in the future (the "assignment/reassignment tool"). The reassignment language did not generally appear on the face of the assignment. Only the short form assignment would be recorded with the Copyright Office. For example, in the magazine industry, where the tool was frequently employed, an author of an article would assign the copyright to the magazine publisher, and the publisher would simultaneously agree to re-transfer the rights back to the author at a later date, subject to the limited rights acquired by the publisher.

(Trial Tr. 255–57, 259–64, 281–82, Perle; Trial Tr. 390–92, 419, 450, 455, Baumgarten).

104. The assignment/reassignment tool was no secret to copyright lawyers doing business under the 1909 Copyright Act. (Trial Tr. 429, 449–50, Baumgarten). It was used by copyright lawyers under the 1909 Act when the need arose, regardless of the industry involved. (Trial Tr. 194, 215, Olsson; Trial Tr. 254, 257, 295–96, Perle; Trial Tr. 390, 392–93, 452–53, 471, 476, Baumgarten).

105. Where the assignment/reassignment tool was employed, the side agreement to reassign the copyright to the author was not always reduced to writing. If the assignment was accompanied by a simultaneous agreement to reassign or an agreement reserving rights to the author, there was a danger that the transaction might be deemed a license rather than a copyright assignment. Under the 1909 Copyright Act, assignments and reassignments of copyrights in unregistered and unpublished works did not have to be in writing, and there was no requirement to record them with the Copyright Office. (Trial Tr. 172, Olsson; Trial Tr. 261–65, 272, Perle; Trial Tr. 391, 405, 451, 458, 489, Baumgarten).

106. Where the assignment/reassignment tool was employed, the reassignment itself was not always reduced to writing. It could have been oral or implied from a course of conduct. Moreover, the reassignment of the copyright was frequently not recorded with the Copyright Office even where it was in writing. (Trial Tr. 272–73, Perle; Trial Tr. 411–12, 454–57, Baumgarten).

107. Authors agreed to use of the assignment/reassignment tool because it was in their interest to avoid a divestive publication of their work, which would cause the work to fall into the public domain. An author, having parted with a particular right and wanting to get on with the business of creating, was often perfectly willing to let the licensee assume the burdens of registration and enforcement, as well as the attendant legal fees. Particularly where there was an ongoing relationship between the author and the user, the author trusted the user to abide by the limitations of their agreement and not to abuse the apparent assignment of all rights, which was executed merely to satisfy formal legal needs. (Trial Tr. 168, Olsson; Trial Tr. 264, Perle).

108. It is generally not possible to discern from the face of a short form assignment of copyright whether it was intended to be a bona fide transfer of all rights under copyright in perpetuity or a more limited license. (Trial Tr. 290–91, 294–95, Perle; Trial Tr. 410, Baumgarten).

109. There are reasons for using the assignment/reassignment tool on the facts of this case, and it was Mr. Perle's opinion that the John H. Wilkins Company and the Hensons employed the tool here. (Trial Tr. 188–91, 215–16, Olsson; Trial Tr. 252–53, 296–98, Perle).

a. First, under the 1909 Copyright Act, an exclusive licensee of valuable rights in an unpublished work such as the John H. Wilkins Company could lose that exclusivity if the owner of the common law copyright published or authorized publication of the licensed work without the requisite copyright notice, and there was at times a substantial question as to what constituted publication. (Trial Tr. 165, 189–90, 219–21, Olsson; Trial Tr. 252–53, Perle; Trial Tr. 402–03, 458–59, Baumgarten).

b. Second, the John H. Wilkins Company could protect and enforce its rights far more effectively if it were the legal owner of the copyrights in the puppets. For example, assuming that the John H. Wilkins Company had acquired the copyrights in the commercials featuring Wilkins and Wontkins but not in the underlying Wilkins and Wontkins puppets, it would not have been able to bring a copyright infringement suit in its own name against another company offering premium items depicting the Wilkins and Wontkins characters, nor would it have been able to prevent another advertiser from creating its own commercial with its own script using the Wilkins and Wontkins characters. (Trial Tr. 461–62, Baumgarten). It may also have been barred from suing an infringer who only copied frames of the commercial depicting the puppets under

the *de minimus* doctrine. (Trial Tr. 223, Olsson).

c. Third, use of the assignment/reassignment tool would enable the John H. Wilkins Company to use its own name in the copyright notice affixed to the Wilkins and Wontkins premiums it offered to its customers. When a company is using a premium to promote its product, it understandably prefers to use its own name on the premium; another's name detracts from the advertising message. (Trial Tr. 190–91, Olsson; Trial Tr. 252–53, 275–76, Perle).

110. The assignment/reassignment tool was used by copyright lawyers in the audiovisual field when the need arose. (Trial Tr. 215, Olsson; Trial Tr. 257, 282–84, 285–86, Perle; *see also* Trial Tr. 471, Baumgarten). Indeed, the 1963 edition of *Nimmer on Copyright* states (at pp. 518–19):

> The problem of indivisibility here under scrutiny is most apparent with respect to magazines, but it is not, of course, unique to that field. Similar questions of whether the person in whose name the copyright notice appears is the assignee-proprietor or merely a licensee have arisen in connection with book and music publishing and may potentially arise in any field in which copyrighted materials are used.

> One context in which the problem may arise in a most serious manner does not seem to be generally appreciated. That is, in connection with motion pictures. It not infrequently happens that a motion picture producer will acquire only 'motion picture rights' in an unpublished work. Thereafter a motion picture photoplay based upon the work is published bearing a copyright notice in the name of the producer or other proprietor of the film. Since the producer is only a licensee of the underlying work and since publication of the film probably constitutes publication of the underlying work insofar as it is incorporated in the film, the result is that the underlying work has been published without proper notice and is hence injected into the public domain . . . .

> *"The problem here posed could be resolved* either by an additional copyright notice on the film in the name of the owner of the underlying work or *by an express grant of all rights to the motion picture producer subject to an agreement by the producer to hold all rights other than motion picture rights in trust for the author with a promise to reconvey upon request by the author.* Such a form of conveyance would be in the interest of both the author and the producer since neither wishes to see the underlying work enter the public domain." (Emphasis supplied, footnotes omitted)

(Trial Tr. 476–77, Baumgarten).

111. Similarly, in a 1957 study on the indivisibility doctrine commissioned by Congress in connection with the copyright law revision effort that led to the enactment of the 1976 Copyright Act, Abraham Kamenstein, who later became the Register of Copyrights, wrote:

> "It would be a mistake to believe that the doctrine of indivisibility had no application in fields other than periodicals. The same problem is present, in varying degrees, in other copyright areas. Copyright in books, plays and music is divided and subdivided every day. The doctrine may have caused less difficulty in certain fields because the circumstances and practices are different."

(Pl.Ex.72(a) at 22; Trial Tr. 158–61, Olsson).

112. *Nimmer on Copyright* and the Kamenstein study on indivisibility are highly regarded authorities in the copyright field. (Trial Tr. 158–61, Olsson; Trial Tr. 249–50, Perle; Trial Tr. 427, 428, Baumgarten).

*The September 16, 1958 Assignment*

113. The September 16, 1958 Assignment signed by Jim Henson and Jane Nebel is not a stand-alone agreement. It is an example of a short form assignment executed for purposes of recordation with the Copyright Office, to satisfy formal legal requirements, and not for the purpose of transferring in perpetuity the copyrights in the Wilkins and Wontkins puppets. It clearly does not contain the complete agreement between the parties because it is missing so many of the terms that would be part of an agreement between an advertiser and an independent creator of

television commercials for that company. (Trial Tr. 185–87, 232–33, Olsson; 265–66, 288–89, Perle).

114. In the late 1950s, when a copyright user wanted to obtain perpetual rights in a character (distinct from rights in a work in which the character appeared) it was the practice of the copyright bar to spell this out in no uncertain terms. One compelling reason for this is that in 1954, the Ninth Circuit had issued its opinion in *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System*, 216 F.2d 945 (9th Cir.1954), which held that the clearest possible language was needed to divest Dashiell Hammet of his rights in his detective character Sam Spade, the principal character in *The Maltese Falcon*, and that his grant of motion picture, radio and television rights in *The Maltese Falcon* to Warner Bros. did not, as asserted by Warner Bros., give it the exclusive right to use Sam Spade in those media. In the wake of this watershed case, the copyright bar was on notice that there was the strongest presumption that even when an author transferred the copyright in a work in which a character was fully delineated, the author retained the right to use the character in sequels or other works. After that decision any copyright lawyer representing a user wishing to buy exclusive rights in a character would make certain that the assignment documents said so unmistakably and unequivocally. (Trial Tr. 179–83, Olsson).

115. The September 16, 1958 Assignment does not contain clear and unequivocal language transferring the copyrights in the Wilkins and Wontkins puppet characters. (Def.Ex. 13A; Trial Tr. 183–84, 206–13, Olsson). Mr. Baumgarten himself recognized that the September 16, 1958 Assignment is not a model of clarity. (Trial Tr. 415, Baumgarten).

116. Even defendants' copyright law expert Mr. Baumgarten would not rely upon the September 16, 1958 assignment alone if he were clearing the rights to use the Wilkins and Wontkins characters for a client. He would conduct further investigation. (Trial Tr. 480–81, Baumgarten; *see also* Trial Tr. 187–88, 233–34, Olsson).

*Recordation of Documents in the Copyright Office*

117. During the relevant time period, Copyright Office records were not necessarily reliable, current or complete. Because the Wilkins and Wontkins puppets were protected by common law copyright, an assignment of the copyrights in them could have been oral, and there was no legal requirement to record documents pertaining to them with the U.S. Copyright Office. Moreover, in the late 1950s, it was a common practice of copyright lawyers, copyright users and authors to record only short form assignment documents with the Copyright Office that did not fully disclose their complete agreement or understanding. (Trial Tr. 171, 174–75, 178–79, Olsson; Trial Tr. 271–73, Perle; Trial Tr. 435–36, 455, 466–68, 489, Baumgarten).

118. In general, a search of Copyright Office records is just the starting point for an investigation into who owns which rights in a given work. This is particularly true in the case of an unregistered work that was protected by common law copyright. A prudent copyright lawyer would not rely upon a Copyright Office search disclosing only a short form assignment before advising a client to use a work, particularly a work protected by common law copyright. (Trial Tr. 176–79, Olsson; Trial Tr. 272–74, Perle; Trial Tr. 466–69, Baumgarten; *see also* J. Taubman, 1 *Performing Arts Management and Law*, § 19.9 at 658–660 (1972) ("Whatever the effect of recordation as to copyrighted works, it would seem that if many forms of literary and artistic properties are not placed under statutory copyright, then it is unlikely that documents relating thereto will be filed in the Copyright Office, and to the extent such documents are filed, that they are necessarily complete. This means that the search in terms of title clearance does not begin or end at the Copyright Office, whether or not undertaken directly by the Copyright Office or by one of the agencies regularly engaged in such activities and who may have on hand facilities prepared by the Copyright Office, such as catalogs of copyright entries.")).

119. In the late 1960s and early 1970s, the Copyright Office was very liberal in ac-

cepting documents for recordation and did not make any inquiry into the validity or legal effect of a document. Then, as now, the Copyright Office accepted for recordation a broad range of documents relating to copyrights other than transfers of registered copyrights. Although it was understood that recording documents other than transfers of statutory copyrights was probably legally ineffective under Section 30 of the 1909 Copyright Act and its implementing regulations, prudent copyright lawyers and users often recorded such documents in the hope of giving actual notice of the contents of such documents to persons searching the records of the Copyright Office. (Trial Tr. 173–76, Olsson; Trial Tr. 272, Perle; Trial Tr. 470, Baumgarten).

*Additional Evidence Indicating that the 1958 Assignment Did not Reflect the Parties' Entire Agreement*

120. The September 16, 1958 Assignment and the October 17, 1958 Assignment were not the only agreements between Jim Henson and Jane Nebel, and/or their successor Muppets, Inc., and the John H. Wilkins Company pertaining to Wilkins and Wontkins and/or television commercials in which Wilkins and Wontkins appeared. (Pl.Ex. 45 (¶ 86)).

121. Defendants concede that the September 16, 1958 Assignment "contains no provisions relating to the performances by the Hensons in the Wilkins and Wontkins television commercials and the Hensons' performances were governed by agreements not contained in the Assignment." (Pl.Ex.83).

122. Such agreements were entered into prior to, at the same time as, and subsequent to the September 16, 1958 Assignment. (Pl. Ex. 45 (¶¶ 87, 88)).

123. In a letter from Jim Young, creative director at M. Belmont Ver Standig Agency, Inc., who was responsible for the John H. Wilkins commercials at M. Belmont Ver Standig Advertising Agency during the approximate period of August, 1958 through May 1961, if not longer, dated September 16, 1958, to John P. Hoag, Jr., Mr. Young stated as follows:

wealth and good times have suddenly overcome [the Hensons] and its [sic] taken years off my life to deal with them at times ... We finally signed an iron-clad contract with them and made considerable concessions to show them we were in good faith. Concessions included the AFTRA rate as stated and many other points, including the 'on-camera' and 'two-voice' rates.

(Pl.Ex. 27D; 27L; 46 (¶ 177); Ver Standig 19, 46–47).

124. Mr. Hefler's videotaped testimony establishes that he was involved with the agreements between the John H. Wilkins Company and Mr. Henson, including the September 16, 1958 Assignment, and that the assignments neither effectuated nor were ever intended to effectuate a transfer by the Hensons to the John H. Wilkins Company of all rights in Wilkins and Wontkins in perpetuity. His testimony further persuades me that the John H. Wilkins Company never intended to sell its coffee and tea (or any other goods) outside of its trading territory; it only acquired a limited license and had no interest in, and did not acquire all rights in Wilkins and Wontkins in perpetuity; and that the John H. Wilkins Company, in any event, agreed not to compete with the Hensons, and therefore could not have used Wilkins and Wontkins for any other purpose. The Assignments were a part of the whole agreement between the John H. Wilkins Company and the Hensons, executed only for the limited purpose it had, which was to promote Wilkins brand coffee in its territory. (Hefler 24, 29–31, 68–69, 37–38).

125. Wilkins and Wontkins were not trademarks of the John H. Wilkins Company; the John H. Wilkins Company did not intend to, and did not use the visual images or character names of the Wilkins and Wontkins puppets as trademarks; and the characters were only intended to be used as part of an advertising campaign that had a limited life. (Hefler at 11–12, 37–38; Pl.Ex. 49 (¶ 22); *JHP, Inc.,* 867 F.Supp. at 182–83; *see also* ¶ 50 above). In none of the correspondence during the period 1957–1973 between the John H. Wilkins Company and its intellectual property counsel, in which numerous issues relating to registration and protection of the

company's trademarks were discussed, is there any reference to the Wilkins and Wontkins puppets as being trademarks or copyrights of the John H. Wilkins Company, nor is any opinion given by that law firm to the effect that those puppets are trademarks or copyrights of the John H. Wilkins Company. (Pl.Ex. 49 (¶ 23)). The documents show that the John H. Wilkins Company had over 35 registered trademarks from the early 1900s through the 1970s and had a regular practice of seeking registration for its trademarks. (Pl.Ex.42).

126. In a letter, dated February 26, 1960, from James Young of the M. Belmont Ver Standig, Inc., which at the time was the John H. Wilkins Company's advertising agency (Pl.Ex.25(F)), to Chemical Corporation of America (d/b/a "FREEWAX"; hereinafter "Chemical"), M. Belmont Ver Standig, Inc. outlined the terms and conditions under which it would make available to Chemical "FREEWAX 'muppet' commercials." (Pl. Ex.35A). Paragraph 4 of the letter states:

> While Chemical Corporation of America and FREEWAX will retain full rights of use, subject to the terms herein, the muppet characters will be copyrighted—and rights retained by—James Henson and/or Muppets, Inc.
> This is to prevent their transfer, sale, or other disposition by Chemical Corporation of America, to any individual, firm or other party without express approval of the copyright-holder.

127. In a letter, dated June 20, 1962, from Alden Murray, the business representative for Muppets Inc. during the approximate period of November 1961 through June, 1962, if not longer (Pl.Exs. 26P, 24H, 27K; 46 (¶ 176)), to Chemical, Mr. Murray resumed discussions with Chemical about Muppet Inc.'s producing television commercials for Chemical using the "Muppets." In his letter, Mr. Murray stated:

> New characters must be created for Free-wax similar to those sketched in the story-boards. As with the Wilkins Coffee type ID's, ownership of the puppets is retained but exclusive use is granted . . . .

(Pl.Ex.35(C)).

128. The Wilkins Coffee Muppet-type TV ID spots were defined as "those situation ID commercials made for the Wilkins Coffee Company using the characters known as 'Wilkins' and 'Wonktins' only." (*See, e.g.,* Pl.Exs. 26(A), 27I (H01232), 31A, 32B, 38A, and 40A).

129. The aforementioned letters demonstrate that, as between the John H. Wilkins Company and Mr. Henson, it was understood that Mr. Henson was to retain the underlying copyright rights in his puppets, including the Wilkins and Wontkins puppets, and that the John H. Wilkins Company was to have exclusive rights of use for a limited purpose and a limited period of time. I specifically find that generalized references in the business correspondence relating to the John H. Wilkins commercials and about "commercial film rights", "exclusive commercial rights", "production rights", "exclusive rights", "ownership of rights", "ownership", when read in context do not demonstrate in any way that the Hensons had given up, in perpetuity, the underlying copyrights in the puppets. (*See, e.g.,* Pl.Exs. 25B, 26H, 27(E), 27F, 27G, 27H, 28G, 31B; Def.Ex. 42). Instead these reflect that certain rights had been licensed, or exclusively licensed. (*Id.*).

130. The September 16, 1958 Assignment itself reflects that it is not the complete agreement between the parties. (Def.Ex. 13A; Pl.Ex. 46, ¶¶ 137–40).

131. The September 16, 1958 Assignment does not contain an integration clause. (Def.Ex.13A).

132. The September 16, 1958 Assignment contains numerous ambiguities. (Def.Ex.13A).

133. The October 16, 1958 Assignment provided in part that:

> James M. Henson and Jane A. Nebel hereby covenant(s) and agree(s) to and with the said John H. Wilkins Company, its successors, legal representatives and assignee, that, at the time of execution and delivery of these presents, THEY WERE the sole and lawful owner(s) of the entire right, title and interest in and to the said inventions and the application for Letters Patent above mentioned, and that the same

are unencumbered and that THEY HAVE good and full right and lawful authority to sell and convey the same in the manner herein set forth. (Def.Ex.16).

134. The October 16, 1958 Assignment would have been unnecessary if the parties had intended the September 16, 1958 Assignment to effect a transfer of all rights to the John H. Wilkins Company.

135. Mr. Hefler testified that the October 16, 1958 Assignment related to the Wilkins and Wontkins "premiums". (Hefler 75–76; Jane Henson 197). The fact that the John H. Wilkins Company affixed a "patent pending" notice on the premiums, and on nothing else, confirms this intent.

136. There is no evidence that the October 16, 1958 Assignment is a pre-printed form for assignments of patent rights.

137. Based on the testimony of Mr. Harry Olsson, which I find persuasive, regarding the then-existing legal climate, I find that, if the parties had intended to transfer, in perpetuity, all copyrights in the Wilkins and Wontkins puppets, separate and apart from their performances in the filmed commercials, they would have used different language from the words used in the September 16, 1958 Assignment. (Trial Tr. 179–83, 185–87, 232–33).

138. Mr. Shur, who was a patent attorney who was engaged on behalf of the John H. Wilkins Company by Mr. Furey in the late 1950s, obtained design patents on two Muppet figures (Wilkins and Wontkins) that were used in the advertising program at the John H. Wilkins Company. (Furey 12).

139. Of all of the non-parties subpoenaed in this action, including Roger H. Hefler, E. William Furey and his law firm, Furey Doolan and Abel, attorneys for the John H. Wilkins Company, William H. Ashplant, Helen Ver Standig and her agency, the M. Belmont Ver Standig Agency, and E. Lee Winegar, none produced the original or a copy, signed or unsigned, of the September 16, 1958 Assignment, or copies of any other agreements regarding Jim Henson or Muppets, Inc. (Pl.Ex. 45 (¶¶ 82, 85(c)); Pl.Ex. 46, (¶¶ 157–61); *see supra* ¶ 34).

140. The owner of the copyright in a puppet character typically retained ownership of the physical puppet in order to exploit it. (Trial Tr. 352, Stone). Neither of the defendants nor their purported predecessors retained physical possession of the original Wilkins and Wontkins puppets performed in the John H. Wilkins Company's advertising commercials. (Pl.Ex. 46 (¶ 167); S. Abensohn 153; Hatch I 16, 17, 19; Ver Standig 51). The Hensons, however, did retain physical possession of the original Wilkins and Wontkins puppets performed in the John H. Wilkins Company's advertising commercials. (Asch 39–41; Jane Henson 184).

141. Although Mr. Hefler was familiar with the John H. Wilkins Company's intellectual property, he did not always use legal terms precisely. For example, he testified that the John H. Wilkins Company copyrights were for "the color combinations on our can, the way the script was written, and the blend name", and that "we didn't have any right to the use the term [Muppets]—the Muppets was copyrighted by Jim Henson." (Hefler 37–39; *See also* Pl.Ex. 42 (MOO1097, MOO1154)).

142. Despite the purported significance of the September 16, 1958 Assignment, documentary evidence, oral testimony, and conduct by the parties establishes that regardless of the purpose of the September 16, 1958 Assignment, it was superseded by the Hensons and the John H. Wilkins Company.

143. I am also persuaded by Mr. Hefler's testimony that regardless of the original intent of the parties or the meaning of the September 16, 1958 Assignment, when the John H. Wilkins Company was finished with the advertising campaign in connection with which it used Wilkins and Wontkins in the mid–1960s, all rights granted by Mr. Henson, including any copyrights, in Wilkins and Wontkins reverted to or were transferred back to him or his company by the John H. Wilkins Company. I also find that this was consistent with the original intent of the parties that any rights in the Wilkins and Wontkins puppets would be terminated once the ad campaign had run its course. (Hefler 20–21, 29–31, 73–76, 93) (Hefler 30, 73–77, 94).

144. In addition, on June 8, 1961, the John H. Wilkins Company and Muppets, Inc. entered another written agreement, which does not appear to contain boilerplate language, regarding, *inter alia,* the production of further television commercials, using, *inter alia,* Wilkins and Wontkins. (Pl.Ex. 24(J)). The June 8th letter agreement was either signed or the parties acted pursuant thereto. (Pl.Ex. 24(J); Hefler 16–19). The June 8th letter agreement subsequently terminated pursuant to a letter dated July 18, 1962, from Mr. Hefler to Jim Henson. (Pl.Ex. 24(J)).

145. Paragraph 9 of this agreement states that "[t]his agreement is intended to supersede all prior agreements between us or our respective predecessors in interest." The John H. Wilkins Company had no predecessors in interest. Muppets Inc.'s only predecessors in interest were the Hensons. (Pl. Ex. 24(J)).

146. Assignment is often referred to as an agreement by lawyers and others. (Trial Tr. 206, Defendants' counsel; Trial Tr. 490, Baumgarten).

147. The June 8, 1961 agreement limited the John H. Wilkins Company's interest in Mr. Henson's productions and characters to the duration of the contract; this demonstrates that the September 16, 1958 Assignment was no longer in effect or that it had not been intended as a transfer of all rights in Wilkins and Wontkins to the John H. Wilkins Company.

148. In addition, with respect to the arrangements for commissions to be paid to the John H. Wilkins Company should the Hensons use the Skip and Scoop characters for other advertisers, pursuant to the 1961 Letter Agreement, the parties also treated the practice set forth in this letter as applying to third party use of Wilkins and Wontkins. (Pl.Ex. 24(H); Hefler 16–21; Henson 35–36, 39–40, 46–47).

149. The type used in the June 8, 1961 letter from the John H. Wilkins Company to the Hensons and Muppets Inc. appears to be the same as that used in other letters sent out to Jim Henson during the 1960s on John H. Wilkins Company letterhead. (Pl.Ex. 24(J)).

*Additional Evidence Pertaining to Parties' Conduct*

150. The parties' course of conduct over 25 years further confirms that the John H. Wilkins Company had, at most, only a limited license to use Mr. Henson's performances of Wilkins and Wontkins and the premiums to promote its coffee in the Washington, D.C. area, and that any interest conveyed in the puppets was terminated after its advertising campaign concluded.

151. As set forth more fully in Paragraphs 43 and 47, after the John H. Wilkins Company advertising campaign had run its course, in approximately 1965, the John H. Wilkins Company discontinued all use of Wilkins and Wontkins. (Hefler 36–37; Furey 65–66, Ashplant 35, 48–52, 89–90; *JHP, Inc.,* at 182–83).

152. As set forth more fully in Paragraphs 167–74, in 1974, the John H. Wilkins Company did not list, as assets of the company, any licenses for or the ownership of any copyrights or trademarks in Wilkins and Wontkins, although its intellectual property counsel conducted due diligence and prepared a comprehensive list of all intellectual property rights it owned at that time, in connection with a sale of all its assets to its immediate "successor" and despite the huge success of Sesame Street beginning in 1969.

153. Defendant Coffee Associates and its predecessors had 30 years to claim ownership of Wilkins and Wontkins. Defendant Coffee Associates did not do so until after Mr. Henson's death.

154. Wilkins and Wontkins were only performed in television commercials and were never performed for entertainment or any other purposes such as television programs or motion pictures. (Pl.Ex. 45, ¶ 92).

155. Muppets, Inc. discontinued producing television commercials prior to the commencement of the first broadcast of the Sesame Street educational television series in 1968 or 1969. (Oz 8, 16; Jane Henson 124–25; Pl.Ex. 49 (¶ 21); Pl.Ex. 33(C)).

156. Commencing in 1954, Jim Henson never sold or otherwise transferred the copyrights in any of his characters, whenever

created, to anyone other than his company. (Pl.Ex. 45, (¶ 38); Russell 23–27; Pretrial Ord. § E (¶ 22); Pl. Exs. 26A, 27I, 29, 30A, 31A, 32B, 33A–C, 34, 35A–C, 36B, 37, and 38; Trial Tr. 45–46, 51, Schube).

157. Mr. Irwin Russell, presently on the Board of Directors of The Walt Disney Company and an attorney specializing in the entertainment field who represented Jim Henson and his companies from the late 1960s until September, 1971, testified that as a guiding principle, Mr. Henson never parted with ownership of any rights, including copyright rights, relating to the characters he created. Rather, he guarded such rights zealously. One example cited by Mr. Russell was a transaction between Mr. Henson and Frito–Lay in or about 1969. (Russell 6–8, 10–11, 23–26, 43–44, 53–54).

158. Throughout the history of Muppet characters, Muppets have been performed only by puppeteers trained by Henson Productions or its predecessors. Over the years, the core puppeteers of the Muppets have remained the same. I find that, in light of this practice and the nature of Mr. Henson's art form, he would not have intended, and did not intend, to transfer rights in perpetuity to his puppets or to separate himself from their performances and creative control over them. (*JHP, Inc.*, 867 F.Supp. at 177; Jane Henson 61–62; Trial Tr. 54–55, Schube; Pl. Ex. 34; Juhl 30).

159. Defendants never attempted to advise Jim Henson Productions or Jim Henson of its claim to own the Wilkins and Wontkins characters until after Mr. Henson's death. In any event, I find that plaintiff did not learn of this claim until June, 1992. (Trial Tr. 60, Schube; *see also,* Berry 48–49).

160. Jim Henson Productions, Inc.'s conduct since the late 1960s does not reflect any belief, acknowledgment, awareness, or intent that the John H. Wilkins Company or its successors owned or claimed to own any copyright rights in the Wilkins and Wontkins puppets. The only "permissions" ever requested by plaintiffs or their predecessors were to use clips of John H. Wilkins Company commercials, and never with respect to the Wilkins and Wontkins puppets or characters. These requests were consistent with

the Hensons' general business practice of seeking permission with respect to use of film clips, even film clips embodying performances of the Muppet puppets. For example, Jim Henson Productions has sought film clip licenses or permissions with respect to the Muppets' appearances on "Sesame Street" and "Sam and Friends", even though it owns the copyrights in all the Muppets therein. This has occurred in those instances where Jim Henson Productions, Inc. was compiling a retrospective program which was composed of clips from prior recorded performances of the Muppets. The "permissions" sought to use film clips of the John H. Wilkins commercials were a few among the dozens of such permissions obtained by plaintiff for its retrospective films (such as those included in Pl.Ex. 84). (D. Abensohn 142–44; Jane Henson 70–71; L. Asch 27–28, 32–34, 36–38; Trial Tr. 41–51, Schube).

161. Although Jim Henson Productions Inc. owns all copyrights in all "Muppet" puppets, in many instances it does not own the copyright in particular filmed performances. In such instances, the owner of the filmed performances has obtained a license from Jim Henson Productions, Inc. to use the filmed performance for specific purposes only, and such owner otherwise has no rights to use the Muppet characters performed therein. (Trial Tr. 44–45, Schube).

162. For many years since at least as early as 1979, the Hensons and/or their company caused to be displayed reproductions of the original Wilkins and Wontkins puppets in numerous exhibitions without requesting permission from defendants or their purported predecessors. (¶ 115(d) of Defendants' Amended Answer to Second Amended Complaint and Counterclaims; Pl.Ex. 9; Asch 37; Henson 81–83).

163. Mrs. Henson's violent physical reaction to Mr. Brady's claim of ownership of Wilkins and Wontkins at his trade show, supports plaintiffs' claim that the Hensons never intended to convey perpetual rights in these characters. (Henson 85, 89, 91–96).

*The 1974 Sale of Assets by the John H. Wilkins Co. to Halco*

164. In or about 1974, certain assets of the John H. Wilkins Company were sold to Halco. (Pl.Ex. 51 (¶ 21); Ashplant at 20–21).

165. Mr. Ashplant, the Chairman of Halco, testified that at the time of that transaction, the John H. Wilkins Company's retail coffee business had been almost entirely phased out and represented no more than a few percent of its business. He also testified that, at the time of that transaction, Halco was aware that the John H. Wilkins Company had discontinued use of the Wilkins and Wontkins puppets many years earlier. (Ashplant at 7, 12–13, 16–17, 89; Pl.Ex. 49 (¶¶ 25–26)).

166. According to Mr. Ashplant, during the 1970's, at the time of the transaction and thereafter, Halco was chiefly engaged in the institutional food service business. Only an insignificant portion of the Halco business was devoted to retail marketing. An even less significant portion of its business was devoted to retail sales of coffee. (Ashplant at 8, 12–13, 50–51, 90; Pl.Ex. 49 (¶ 27)).

167. The Asset Purchase Agreement dated August 9, 1974, pursuant to which certain assets of the John H. Wilkins Company were purchased by Halco, does not itemize as assets owned by the John H. Wilkins Company subject to the transfer any tangible or intangible rights (including any copyrights, patents or trademarks, or registrations or applications for registration) pertaining to the Wilkins and Wontkins puppets. (Pl.Ex. 54).

168. As evidenced by the letter dated June 14, 1974 and schedules and booklet attached thereto from Samuel Scrivener, Jr. of Scrivener Parker Scrivener and Clarke—whom E. William Furey has identified as the John H. Wilkins Company's intellectual property counsel (Furey at 58–59)—to "Wilkins Coffee Company" (the name under which the John H. Wilkins Company was doing business), the John H. Wilkins Company directed its counsel to perform an evaluation of all patents, trademarks, assumed names and copyrights as to which the John H. Wilkins Company claimed any rights in connection with the proposed asset purchase by Halco. In the June 14, 1974 letter, Mr. Scrivener states at page 4:

> The Schedules attached to this letter constitute an accurate and complete description of all patents, trademarks, trade names, assumed names and copyrights, and all applications therefor, presently owned or held by the company or under which the company owns or holds any license or in which the company owns or holds any interest.

The attached schedules and booklet do not list any rights with respect to the Wilkins and Wontkins puppets, including any trademarks, copyrights or patent rights, except expired patent rights. (Pl.Ex. 55B).

169. Messrs. Furey and Ashplant testified that, to the best of their knowledge, the assets listed on Schedules A–F and the booklet[5] prepared by Mr. Scrivener and annexed to his June 14, 1974 letter are the same as those that were ultimately listed on the Disclosure Schedule referred to in ¶ 3.12 of the August 9, 1974 Asset Purchase Agreement. (Furey at 86–97, 147–50; Ashplant at 43, 97–98). They also testified that, to the best of their knowledge, the booklet was the Disclosure Schedule referenced in ¶ 3.12 of the Asset Purchase Agreement. (Furey at 111, 117, 146–150; Ashplant at 97–98). Paragraph 3.12 of said Agreement states:

> the Disclosure Schedule contains an accurate and complete description of all patents, trademarks, trade names, assumed names and copyrights, and all applications therefor, presently owned or held by Wilkins, under which Wilkins owns or holds any license or in which Wilkins owns or holds any interest.

(Pl.Ex. 54 (at 001340)). Additionally, paragraph 10.05 of the Agreement states that the Agreement, including the schedules and other writings referred to in the Agreement, "contains the entire understanding of the parties." (*Id.* at 001378).

170. The accuracy and completeness of the Disclosure Schedules and booklet discussed in the preceding paragraph was confirmed both by Mr. Furey and Mr. Ashplant, counsel for seller and buyer, respectively. (Furey at 86–97, 129–157; Ashplant at 25–30, 36, 41–43, 51, 94–95, 97–98). This is further corroborated by the Assignment of Trade-

---

**5.** The "booklet" has been identified as Exhibit 32 at the May 27, 1993 deposition of Robert Hatch and as Exhibit 13 at the June 8, 1993 deposition of William Furey.

mark Registrations dated March 20, 1975 from the John H. Wilkins Company to Halco. (Pl.Ex. 56). The trademark registrations listed therein match those listed in Pl.Ex. 55B. Also, Messrs. Furey and Ashplant testified that they were not aware of any amendments or modifications to the Asset Purchase Agreement or any side agreements thereto. (Furey at 149–50, 155–156; Ashplant at 47–48).

171. With respect to Halco's acquisition of certain assets of the John H. Wilkins Company, neither Mr. Ashplant nor Mr. Furey recalls any negotiations concerning the Wilkins and Wontkins puppets or any discussion of Wilkins and Wontkins in connection with the sale of the goodwill of the John H. Wilkins Company. (Furey at 157–58; 163–65; Ashplant at 35, 48–52, 90).

172. Mr. Furey testified that he did not know whether, at the time of the 1974 Asset Purchase Agreement, the John H. Wilkins Company owned any rights in Wilkins and Wontkins, and that, in any event, he was not aware that the John H. Wilkins Company owned any copyrights in Wilkins and Wontkins at that time. (Furey 124, 144–45).

173. Mr. Ashplant testified that, with respect to Halco's acquisition of certain assets, Halco did not think the Wilkins and Wontkins characters were among the assets it was acquiring from the John H. Wilkins Company. (Ashplant at 27–30, 45, 48, 90, 91, 94, 97, 98). He further testified that Halco had no interest in them and no plans to use them. (*Id.* at 16–17, 20, 35, 90; Furey 157–65).

174. Mr. Ashplant testified that, during the period 1974–1981, neither Halco, Tobin nor any related entity, subsidiary, affiliate, or parent: (1) used the Wilkins and Wontkins puppets in any form or medium; (2) licensed the right to use them to any other person or entity; or (3) ever planned to use or license them for any purpose. (Ashplant at 16–20, 50–53); Pl.Ex. 49 (¶¶ 35 and 38).

### CONCLUSIONS OF LAW

175. The Wilkins and Wontkins puppets are unpublished, original works of authorship and constitute copyrightable subject matter subject to the full protection of the United States Copyright laws. *See Jim Henson Productions, Inc. v. John T. Brady & Assoc.,* 867 F.Supp. 175, 186 (S.D.N.Y.1994).

176. Under the 1909 Copyright Act, common law copyright ownership in the Wilkins and Wontkins puppets vested initially in the authors thereof, namely, Jim Henson and Jane Nebel Henson. *See, e.g.,* 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright,* § 5.01[B] at 5–6 (1995 & Supp.1996) ("*Nimmer*"); 17 U.S.C. § 4 (1976).

177. Under the 1909 Copyright Act, a transfer of common law copyrights did not have to be in writing. *Epoch Producing Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 747 (2d Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). *Accord Jerry Vogel Music Co. v. Warner Bros. Inc.,* 535 F.Supp. 172, 175 (S.D.N.Y.1982); 3 *Nimmer,* § 10.03[B][2] at 10–45.

178. The Hensons duly transferred their copyright rights, in, *inter alia,* the Wilkins and Wontkins puppets to their newly-formed, family-owned company, Muppets Inc., in or about November 1958, orally or by conduct. *Id.*

179. Even assuming, *arguendo,* that the Hensons' transfer of their copyright rights in the Wilkins and Wontkins puppets to their company, Muppets Inc., is insufficiently demonstrated, Jane Henson and the Estate of Jim Henson have ratified such transfer by joining in this lawsuit or, alternatively, are the owners thereof.

180. Jim Henson Productions' corrected copyright registrations for the Wilkins and Wontkins puppets constitute *prima facie* evidence of the validity of the copyrights and the facts stated in the corrected certificates, including plaintiffs' ownership of the copyrights in said works, and such registrations are valid and in full force. 17 U.S.C. § 410(c).

181. Defendants have the burden of disproving Jim Henson Productions' ownership of the copyrights in the Wilkins and Wontkins puppets and the facts stated in its certificates of copyright registration. *Princess Fabrics Inc. v. CHF, Inc.,* 922 F.2d 99, 102 (2d Cir.1990); *Gaste v. Kaiserman,*

863 F.2d 1061, 1064 (2d Cir.1988); *Tienshan, Inc. v. CCA Internat'l (N.J.), Inc.*, 895 F.Supp. 651, 656 (S.D.N.Y.1995); *United Feature Syndicate, Inc. v. Koons*, 817 F.Supp. 370, 376 (S.D.N.Y.1993).

182. Defendants bear the burden of proof at trial on their counterclaim and affirmative defenses that the copyright rights in the Wilkins and Wontkins puppets were ultimately transferred to them. *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1176 (3d Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); *Barker v. Goldberg*, 705 F.Supp. 102, 104 (E.D.N.Y.1989).

183. Whether or not defendants can establish ownership of the copyrights in Wilkins and Wontkins by virtue of a valid transfer of the copyrights by the Hensons depends, essentially, on whether defendants have sustained their burden of proving that the mutual intention of the John H. Wilkins Company and the Hensons was to effect an irrevocable transfer of said copyrights to the John H. Wilkins Company. *Gaste*, 863 F.2d at 1064; *Killiam Shows, Inc.*, 522 F.2d at 746 n. 7.

■ 184. The purpose of U.S. copyright laws is to "promote" the production of creative works. U.S. Const., Art. I § 8, Cl. 8. It has long been recognized that in order to stimulate authorship and intellectual expression, authors must have the economic incentive of ownership rights. *See Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). In enacting the 1976 Copyright Act, Congress strengthened protections for authors and created a legislative framework designed to prevent unintended divestments of their rights. The Act reaffirms the principle that the "author" is "the fundamental beneficiary of copyright under the Constitution." H.R.Rep. No. 94–1476, 94th Cong.2d Sess. at 140 (1976) (*"House Rep."*). Thus, under both the 1909 and 1976 Copyright Acts, unless the author has given up his or her rights under copyright in a clear and unequivocal manner, he or she retains these rights. *See Warner*

*Bros. Pictures, Inc. v. Columbia Broadcasting System*, 216 F.2d 945, 949 (9th Cir.1954) (quoting *Philipp v. Jerome H. Remick & Co.*, 145 F.Supp. 756, 758 (S.D.N.Y.1956) ("The clearest language is necessary to divest the author of the fruits of his labor.")), *cert. denied*, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087–88 (9th Cir.1989); *Cassway v. Chelsea Historic Properties*, 1993 Copyright Law Decisions ¶ 27,071 at 27,264, 1993 WL 64633 (E.D.Pa.1993) *Landon v. Twentieth Century–Fox Film Corp.*, 384 F.Supp. 450, 456 (S.D.N.Y.1974).

185. Documents, such as the September 16, 1958 Assignment, drafted by counsel for the assignee, the John H. Wilkins Company, should be construed against the drafter. *Warner Bros. Pictures*, 216 F.2d at 949; *Cheever v. Academy Chicago, Ltd.*, 690 F.Supp. 281, 287 (S.D.N.Y.1988).

186. Any ambiguities or doubts concerning the scope of rights assigned by the Hensons, as authors of rights protected under copyright, pursuant to the September 16, 1958 Assignment must be construed in favor of the Hensons. *See Warner Bros. Pictures*, 216 F.2d at 949; *Philipp*, 145 F.Supp. at 758; *S.O.S. Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087–1088 (9th Cir.1989); *Hirshon v. United Artists Corp.*, 243 F.2d 640, 644 n. 8 (D.C.Cir. 1957).

187. In light of the fact that the September 16, 1958 Assignment is not an integrated document, contains ambiguities, refers to other agreements pertaining to the subject matter thereof, and has no merger clause, and the fact that copyright assignments do not typically stand alone but are generally part of or subject to a larger agreement between the parties, I must determine whether the parties thereto intended to effect a perpetual assignment of all rights in the Wilkins and Wontkins puppets by weighing other evidence of their agreement, including the testimony of witnesses, other documentary evidence, the surrounding circumstances, the conduct of the parties and relevant customs and practices [6] along with

6. I find the customs and practices of the copyright bar and the television and commercial industry during the 1950s and 1960s particularly important because of the apparent inability of

the September 16, 1958 Assignment. *Bourne v. Walt Disney Co.,* 68 F.3d 621, 627–29 (2d Cir.1995), *cert. denied,* 517 U.S. 1240, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996); *Killiam Shows, Inc.,* 522 F.2d at 746 n. 7; *see also Goodis v. United Artists Television, Inc.,* 425 F.2d 397, 403 (2d Cir.1970) (taking into account relevant business practices and customs in determining whether assignment of rights to magazine publisher and subsequent publication divested original author of all rights in novel).

188. In the absence of a merger clause in the September 16, 1958 Assignment, it would be an abuse of my discretion not to weigh all the extrinsic evidence shedding light on the agreement between the Hensons and the John H. Wilkins Company. *Bourne,* 68 F.3d at 627.

■ 189. The September 16, 1958 Assignment is only one piece of the overall agreement between the Hensons and the John H. Wilkins Company. *Jim Henson Productions,* 867 F.Supp. at 178. Where, as here, the documentary record of the agreement(s) between the contracting parties is incomplete, it is necessary to consider other evidence, including oral testimony, relevant documentation, conduct of the parties, surrounding circumstances and relevant customs and practices existing at the time to determine their intent. *See, e.g., Killiam Shows, Inc.,* 522 F.2d at 746 n. 7; *Lebanon Steel Foundry v. National Labor Relations Board,* 130 F.2d 404, 407–08 (D.C.Cir.1942), *cert. denied,* 317 U.S. 659, 63 S.Ct. 58, 87 L.Ed. 530 (1942).

■ 190. Documents bearing on the terms of the agreement(s) between the Hensons, Muppets Inc. and the John H. Wilkins Co., including, among others, the September 16, 1958 Assignment, should be read together in order to discern the intent of the Hensons and the John H. Wilkins Company. *Bourne,* 68 F.3d at 627–28; *Nofziger Communications, Inc. v. Birks,* 989 F.2d 1227, 1230–31

(D.C.Cir.1993); *Gordon v. Vincent Youmans, Inc.,* 358 F.2d 261, 263 (2d Cir.1965).

191. Mr. Hefler's and Mrs. Henson's testimony as to the understanding and agreement between the Hensons and the John H. Wilkins Company concerning the Wilkins and Wontkins puppets and the rights relating thereto is the most compelling extrinsic evidence of the parties' intent. *Bloom v. Hearst Entertainment Inc.,* 33 F.3d 518, 524 (5th Cir.1994); *Murray v. Gadsden,* 197 F.2d 194, 201–02 (D.C.Cir.1952); *Peugh v. Davis,* 96 U.S. 332, 336, 24 L.Ed. 775, 776 (1877).

192. The testimony of Mr. Hefler and Mrs. Henson, the weight of the documentary evidence, and the conduct of the parties establish that:

(a) During the late 1950s and early to mid–1960s, the John H. Wilkins Company entered into agreements with Jim Henson, Jane Henson and later their company, Muppets, Inc., for the purpose of engaging the services of Jim and Jane Henson, and later Muppets, Inc., to produce original television commercials promoting the coffee product of the John H. Wilkins Company, which commercials featured performances by the Hensons and of the puppets, Wilkins and Wontkins (the "Agreements");

(b) In entering into the Agreements, the parties never intended to, and did not, grant perpetual or unlimited rights to the John H. Wilkins Company to use the television commercials or the Wilkins and Wontkins puppets. Rather, the parties intended to grant to the John H. Wilkins Company only the right to use the television commercials featuring the Hensons' and Muppets, Inc.'s performances of the Wilkins and Wontkins puppets and to use likenesses of the Wilkins and Wontkins puppets for related promotional purposes in connection with the John H. Wilkins Company's continued broadcast of such commercials and in conjunction with the

---

statutory copyright law—at least during this period—to keep pace with the increasing commercial exploitation of copyright rights. *See New Fiction Pub. Co. v. Star Co.,* 220 F. 994, 996 (1915) (commenting as early as 1915 on the increased commercial exploitation of copyrighted works

and noting that "[t]he motion picture scenario, the daily short story in the newspaper, the growing vogue of the concise one-act play ... have all been developments towards specialization, which doubtless render particular rights of increasing importance....").

continuation of the business relationship between the John H. Wilkins Company and Muppets, Inc., which assumed the creative involvement of Muppets, Inc. and Jane and/or Jim Henson. This business relationship ended in the early to mid–1960s, when Muppets, Inc. ceased producing television commercials for the John H. Wilkins Company;

(c) Further, the parties never intended by these Agreements to give the John H. Wilkins Company any rights, without the express consent of Muppets, Inc. or its successors in interest, to use the television commercials or to use the Wilkins and Wontkins puppets appearing in them, except for the purpose of promoting the coffee of the John H. Wilkins Company during the life of the advertising campaign for which such commercials were created and only in its trading area. This restriction constituted an integral part of the Agreements, which enabled Jim Henson, Jane Henson and Muppets, Inc. to protect and maintain their own artistic integrity and to control and preserve the value of their creations. *Bloom*, 33 F.3d at 524; *Murray*, 197 F.2d at 201–02 (D.C.Cir.1952); *Peugh*, 96 U.S. at 336.

193. Defendants are bound by the testimony of Mr. Hefler, President and CEO of the John H. Wilkins Company, defendants' purported predecessor. Fed.R.Evid. 801(d)(2)(B), Advisory Committee Note 1972; *In re Columbia Securities Litigation*, 155 F.R.D. 466, 478 (S.D.N.Y.1994); *Burwell v. Crist*, 373 F.2d 78, 80 (3d Cir.1967); *General Finance, Inc. v. Stratford*, 109 F.2d 843, 843–44 (App.D.C.1940); *Sperber v. Washington Heights–West Harlem–Inwood Mental Health Council, Inc.*, No. 82 CIV 7428, Slip Op. at 4–8 (S.D.N.Y. Nov. 21, 1983), *vacated and withdrawn on other grounds*.

194. Deliberate informed acts of the Hensons and the John H. Wilkins Company and their successors subsequent to the entry by the Hensons and the John H. Wilkins Company into their Agreements and before any controversy arose as to the effect of the Agreements may be used in determining the meaning of the Agreements. *Brooklyn Life Insurance Co. v. Dutcher*, 95 U.S. 269, 273,

24 L.Ed. 410 (1877) ("There is no surer way to find out what parties meant, than to see what they have done."); *Ocean Transport Line, Inc. v. American Philippine Fiber Industries, Inc.*, 743 F.2d 85, 91 (2d Cir.1984); *Sanchez v. Maher*, 560 F.2d 1105, 1108 (2d Cir.1977); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 264 (2d Cir.1965); *Nationwide Auction Co. v. Lynn*, 1996 WL 148489, at *7 (S.D.N.Y. April 1, 1996) ("It is well settled that the parties' actual course of performance is to be given great weight when interpreting an agreement."); *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

195. The conduct of the parties subsequent to the assignment supports plaintiffs' copyright ownership claim. *Viacom International, Inc. v. Lorimar Productions Inc.*, 486 F.Supp. 95, 98 n. 3 (S.D.N.Y.1980) (citing, *inter alia*, *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 33 S.Ct. 967, 57 L.Ed. 1410 (1913)); *Accord, Klein v. Miles*, 35 A.2d 243, 245 (1944) (*quoting Brooklyn Life Insurance Co. v. Dutcher*, 95 U.S. 269, 273, 24 L.Ed. 410 (1877)).

196. The following facts constitute additional evidence confirming that the John H. Wilkins Co. and the Hensons did not intend to transfer all rights in the Wilkins and Wontkins puppets:

(a) Defendants have failed to prove any payment to the Hensons consistent with a transfer of the copyright in the Wilkins and Wontkins puppets. *Playboy Enterprises, Inc. v. Dumas*, 831 F.Supp. 295, 305 n. 10 (S.D.N.Y.1993) (citing *Geisel v. Poynter Products, Inc.*, 295 F.Supp. 331, 339 (S.D.N.Y.1968) (noting that "the price paid may be a circumstance probative of the scope of the rights purchased....")), *modified on rehearing*, 840 F.Supp. 256 (S.D.N.Y.1993), *aff'd in part and rev'd in part*, 53 F.3d 549 (2d Cir.), *cert. denied*, 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 491 (1995); *accord Warner Bros. Pictures*, 216 F.2d at 949.

(b) Artists including Jim Henson did not customarily relinquish all rights in their characters. *Warner Bros. Pictures, Inc. v. Columbia Broadcasting System,* 216 F.2d at 949.

(c) The Hensons did not relinquish physical possession of the Wilkins and Wontkins puppets to the John H. Wilkins Company. *Cf. Chamberlain v. Feldman,* 300 N.Y. 135, 89 N.E.2d 863 (1949); *Pushman v. New York Graphic Society,* 287 N.Y. 302, 39 N.E.2d 249 (1942).

197. Under the 1909 Copyright Act, which was in effect in 1958, copyrights were "indivisible," meaning that the bundle of rights that accrued to a copyright owner could only be assigned as a whole, and the transfer of anything less than all rights was deemed a license rather than an assignment. *See generally* 3 *Nimmer,* § 10.01 at 10–5 to 10–19; A.L. Kaminstein, *Study No. 11, Divisibility of Copyrights* (1957) in 1 *Studies on Copyright* 623 (1963); *Goodis v. United Artists Television, Inc.,* 425 F.2d 397, 400 (2d Cir.1970) (stating that the distinction between a licensee and an assignee "rests on the doctrine of 'indivisibility of copyright,' which rejects partial assignments of copyright and requires a proprietor or assignee of a copyright to hold nothing less than all the rights in a copyrighted work"); *Morse v. Fields,* 127 F.Supp. 63 (S.D.N.Y.1954). The indivisibility doctrine had considerable impact on the enforcement of copyrights against third party infringers because a licensee, unlike an assignee of all rights under copyright, generally lacked standing to sue for infringement. *New Fiction Pub. Co.,* 220 F. at 996 ("Less than an assignment of the entire copyright cannot carry the causes of action (if the right is invaded) which the act accords to the owner or assignee.") (citing Mr. Bowker in Copyright, Its History and Its Law 49 (1912)));[7] *Goldwyn Pictures Corp. v. Howells Sales Co.,* 282 F. 9, 11 (2d Cir.1922) (noting that "the inability of a licensee to sue for an infringement is no longer an arguable question" (citing Walker on Patents § 400). Further, a licensee generally could not use its own name in a copyright notice or obtain a copyright registration. *See Goodis,* 425 at 400; *Hirshon v. United Artists Corp.,* 243 F.2d 640, 643 (D.C.Cir.1957); *Group Publishers, Inc. v. Winchell,* 86 F.Supp. 573, 576–77 (S.D.N.Y.1949); *Morse,* 127 F.Supp. at 64 (citing *American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 296, 28 S.Ct. 72, 52 L.Ed. 208 (1907)); 1 *Nimmer,* § 5.01[B] at 5–6.1.

198. Under the 1909 Copyright Act, an author could retain beneficial ownership of a copyright he had ostensibly transferred to another. *See, e.g., Bisel v. Ladner,* 1 F.2d 436 (3d Cir.1924); *April Productions, Inc. v. G. Schirmer, Inc.,* 308 N.Y. 366, 375, 126 N.E.2d 283 (1955); 3 *Nimmer,* § 10.01[B] at 10–11.

199. It may be presumed that the Hensons and the John H. Wilkins Company, or the attorneys preparing legal documents pertaining to their agreements, had constructive knowledge of the problems and practices arising out of or relating to the indivisibility doctrine under the 1909 Copyright Act. *See, e.g., United States Naval Institute v. Charter Communications,* 875 F.2d 1044, 1049 (2d Cir.1989) *Warner Bros. Pictures,* 216 F.2d at 949. *See generally* 3 *Nimmer,* § 10.01 at 10–5 to 10–22; A.L. Kaminstein, *Study No. 11, Divisibility of Copyrights* (1957) in 1 *Studies on Copyright* 623 (1963). *See also* Section F, ¶¶ 59–117 above; *Cox v. District of Columbia,* 821 F.Supp. 1, 18 (D.D.C.1993), *aff'd,* 40 F.3d 475, 1994 WL 609522 (D.C.Cir.1994); 21A Am.Jur.2d, *Customs And Usages* § 41 at 770 (1981 & Supp.1994); A.L. Corbin, 3 *Corbin On Contracts,* § 557 (1960); *Skandia America Reinsurance Corp. v. Schenck,* 441 F.Supp. 715, 724 (S.D.N.Y.1977).

200. Plaintiffs' expert witnesses are competent to testify in their respective areas set forth in the facts above. F.R.E. Rule 702.

201. Defendants have failed to sustain their burden of proving that the September

---

**7.** The doctrine of the indivisibility of copyright pertains "primarily to the requisite interest needed to bring an infringement action." *Goodis,* 425 F.2d at 400. Affording standing to the registered copyright proprietor alone avoids the problematic situation whereby any and every licensee of the copyright owner may obtain a separate judgment against an infringing defendant "for one and the same violation of a copyright which no one of them owned, but in respect of which each had only certain special or limited rights." *New Fiction Pub. Co.,* 220 F. at 996.

16, 1958 Assignment divested the Hensons of their copyrights in the Wilkins and Wontkins puppets. *Warner Bros. Pictures*, 216 F.2d at 949; *Killiam Shows, Inc.*, 522 F.2d at 746 n. 7; *Freudenthal v. Hebrew Publishing Co.*, 44 F.Supp. 754, 755 (S.D.N.Y.1942).

202. Defendants have failed to sustain their burden of proving copyright ownership where their only proof of a transfer is the September 16, 1958 short form assignment document prepared by defendants' predecessor's counsel and recorded in the Copyright Office, because the overwhelming weight of the evidence—namely, the testimony of witnesses with first-hand knowledge (in particular the testimony of Roger Hefler), other documentary evidence, the conduct of the parties, and relevant customs—does not indicate that the parties intended to convey rights beyond the duration of the John H. Wilkins Company's advertising campaign. *Gaste*, 863 F.2d at 1064; *Compton v. Atwell*, 207 F.2d 139, 140 (D.C.Cir.1953); *Broadcast Music, Inc. v. Taylor*, 10 Misc.2d 9, 55 N.Y.S.2d 94, 102–04 (N.Y.Sup.Ct.1945); *see also Central Hanover B. & T. Co. v. Commissioner of Int. Rev.*, 159 F.2d 167, 169 (2d Cir.) (L.Hand, J.), *cert. denied*, 331 U.S. 836, 67 S.Ct. 1518, 91 L.Ed. 1848 (1947) ("There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure."); *Murray v. Gadsden*, 197 F.2d 194, 201–02 (D.C.Cir.1952).

■ 203. The recordation of the September 16, 1958 Assignment in the U.S. Copyright Office has no legal force or effect as a matter of law. 17 U.S.C. § 205(c); 1909 Copyright Act, 17 U.S.C. §§ 28, 30; *Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 456 F.Supp. 531, 536 (S.D.N.Y.1977) (citing *Epoch Producing Corp. v. Killiam Shows, Inc.* 522 F.2d 737 (2d Cir.1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) and *Rose v. Bourne, Inc.*, 176 F.Supp. 605, 610 (S.D.N.Y.1959) (execution and recording of a copyright assignment does not create a legal ownership in the publications that did not already exist)), *aff'd*, 592 F.2d 651, 655 (2d Cir.1978); *Pantone,*

*Inc. v. A.I. Friedman, Inc.*, 294 F.Supp. 545, 551–52 (S.D.N.Y.1968).

■ 204. A payment of royalties is as consistent with a license as it is with an assignment, and thus does not in itself imply an assignment. 3 *Nimmer,* § 10.03[B] at 10–42 n. 33; *Ilyin v. Avon Publications, Inc.*, 144 F.Supp. 368 (S.D.N.Y.1956). Accordingly, the fact that the Hensons paid the John H. Wilkins Company a fee in connection with the commercials featuring performances of the Wilkins and Wontkins puppets that the Hensons made for other advertisers does not prove that an assignment was effected in this case.

205. Even assuming that defendants have sustained their burden of proving that copyright rights in certain individual television commercials and/or the Wilkins and Wontkins premiums were assigned by the Hensons to the John H. Wilkins Company pursuant to the September 16, 1958 Assignment, defendants have failed to meet their burden of proving that the Hensons assigned any other copyright rights in the Wilkins and Wontkins puppets to the John H. Wilkins Company. *Gaste*, 863 F.2d at 1064; *Warner Bros. Pictures*, 216 F.2d at 949; *Blendingwell Music, Inc.*, 612 F.Supp. at 480; *Compton*, 207 F.2d at 140; *Broadcast Music, Inc. v. Taylor*, 10 Misc.2d 9, 55 N.Y.S.2d 94, 102–04 (N.Y.Sup.Ct.1945); *Murray*, 197 F.2d at 201–02.

206. Even if defendants have sustained their burden of proving that the September 16, 1958 Assignment did effect a transfer of copyright ownership in the Wilkins and Wontkins puppets, the transfer was still subject to the limitations of the parties' agreement that the puppets could only be performed by the Hensons and used by the John H. Wilkins Company for its advertising campaign in the Washington, D.C. area to sell its coffee to the retail trade, and defendants are bound by said limitations. *S.O.S., Inc.*, 886 F.2d at 1087–1088; *Love v. Kwitny*, 706 F.Supp. 1123, 1131 (S.D.N.Y.1989) (the burden rests with defendant to prove that defendant did not exceed the scope of the assignment); *McCord v. Broadcast Music, Inc.*, 89 N.Y.S.2d 772, 774 (N.Y.Sup.Ct.1949).

207. Even assuming that defendants have sustained their burden of proving that copy-

right rights in the Wilkins and Wontkins puppets were assigned by the Hensons to the John H. Wilkins Company pursuant to the September 16, 1958 Assignment, all such rights were reconveyed to the Hensons by the John H. Wilkins Company orally, by conduct, or pursuant to a letter agreement dated June 8, 1961. *See, e.g., Clark v. Clark,* 535 A.2d 872, 876 (D.C.1987); 3 *Nimmer,* § 10.03[B][1] at 10–43–44; *Law v. National Broadcasting Co.,* 51 F.Supp. 798 (S.D.N.Y. 1943). Further, by virtue of the agreement of the parties that the rights granted to the John H. Wilkins Company would revert to the Hensons after the duration of the ad campaign, those rights reverted automatically upon termination of the campaign. *Bourne,* 68 F.3d at 627–28; *Bisel,* 1 F.2d at 436; *Murray,* 197 F.2d at 201; *Clark,* 535 A.2d at 875; 3 *Nimmer,* § 10.03[B][1] at 10–43–44.

### *CONCLUSION*

Based on the above and the record and proceedings in this action, plaintiffs are entitled to judgment against defendants on plaintiffs' claim for relief.

Plaintiff shall submit a form of judgment on two days notice.

SO ORDERED.